**ILLINOIS CENTRAL RAILROAD COMPANY, Louisiana & Arkansas Railway Company, Louisville and Nashville Railroad Company, New Orleans & Northeastern Railroad Company, Texas & New Orleans Railroad Company, and The Texas and Pacific Railway Company, Plaintiffs,**

v.

**GULF, MOBILE & OHIO RAILROAD COMPANY, Defendant.**

**Civ. A. No. 9322.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Feb. 10, 1961.

---

6. McDonald v. Humphrey, 168 F.2d 519, 520; Hunter v. McDonald, 10 Cir., 159 F.2d 861.

Monroe & Lemann, J. Raburn Monroe, Chaffe, McCall, Phillips, Burke & Hopkins, Harry McCall, Jr., New Orleans, La., for plaintiffs.

Curtis, Foster, Dillon & Huppenbauer, Gerard M. Dillon, John C. Foster, Rivet & Rivet, Charles J. Rivet, New Orleans, La., for defendant.

J. SKELLY WRIGHT, District Judge.

This case affords another example [1] of the occult science of drafting big contracts for big undertakings in which elaborate recitals, detailed descriptions and nice definitions, cautiously conjunctive and disjunctive statements and restatements, wondrously complex formulae, deftly balanced essential and non-essential, superior and subordinate stipulations, exceptions and exclusions and provisos, intricately interwoven references back and references forward, multicolored exhibits, and artistically arranged divisions and subdivisions, often crowd out the few plain words that would settle beyond argument the intent of the parties on some fundamental aspect of the agreement. In this instance the offending instrument is the contract entered into between the City of New Orleans and various railroads for the construction, financing and operation of the recently completed Union Passenger Terminal at New Orleans.

Plaintiffs, users of the terminal, seek a judgment compelling defendant, which has entirely stopped serving this area, to continue making contributions toward the cost of operating the facility. The Gulf, Mobile & Ohio Railroad Company (GM&O) denies the obligation and counterclaims for the amounts paid by it on this account since it withdrew from the New Orleans District. All the relevant facts are admitted and both sides pray for summary judgment. Since no issue of fact is presented and the case turns wholly on the interpretation of certain clauses of the contract, that procedure is appropriate.

The plan embodied in the agreement is basically simple. The City undertook to acquire land and construct a single central terminal to accommodate all railroad passenger traffic to and from New Orleans, and the affected carriers agreed to relocate their lines and use the facility exclusively. The project was to be financed by the City through the sale of bonds in a total amount of $15,000,000, the last of which would mature in fifty years. But this obligation was passed on to the carriers which agreed to pay the City rentals sufficient to service the debt and retire the bonds as they matured ("Normal Rental"). Moreover, in the event the bond proceeds proved insufficient to defray the full cost of construction, the railroads undertook to furnish the necessary additional monies through a supplemental rental ("Prepaid Additional Rental"). By separate provision, the carriers also assumed the full burden of maintaining and operating the terminal ("Maintenance and Operations Expenses"), as well as installment payments for new switching locomotives and the cost of future capital improvements ("Additions and Betterments").

All of these charges were apportioned among the railroads more or less in accordance with the use each made of the new facility. But, by express stipulation, every original subscriber remained bound for the entire primary 50-year term to contribute its share of the rentals, regardless of its withdrawal from the terminal and its complete discontinuance of passenger operations in the New Orleans area. The question presented is

---

1. See, e. g., **Texas and New Orleans R. Co. v. City of New Orleans**, D.C.E.D.La., 185 F. Supp. 85.

whether the same thing holds true with respect to the other obligations undertaken, particularly Maintenance and Operations Expenses. Plaintiffs say it does. Defendant denies it.

The problem arises here because GM&O, one of the original subscribers to the 1947 agreement, entirely discontinued its passenger operations in this area on March 8, 1954, a month before the terminal opened for traffic in April of that year, and, after paying its assessed share of maintenance and other non-rental expenses under protest for four years, has, since June, 1958, refused to contribute further to these accounts. The other railroads, which must otherwise make up the deficit, ask that defendant be compelled to continue payments, while GM&O, by counterclaim, seeks to recover back the monies paid under protest, amounting to $135,876.91.

In 190 pages one would expect to find language explicitly saying whether a carrier which withdraws from the area and stops using the terminal is or is not nevertheless bound to continue contributing to the cost of operating the facility. But neither side has pointed to an express provision on the matter and an independent search of the contract confirms that they have overlooked nothing. The only portions of the contract directly relating to maintenance are Section 34, which establishes the obligation of each carrier to share the expense, and Section 35, which governs the apportionment of operation costs (as well as rental) among the several carriers. The first, in pertinent part, provides:

"Section 34. A. The Carriers shall pay to the New Orleans Union Passenger Terminal the entire cost of maintenance and operation of the Union Passenger Terminal, apportioned among the Carriers as follows:

"(i) The cost of maintenance and operation of each zone for each month shall be determined as provided in this agreement. Subject to the provisions of Section 35, each Carrier shall pay its share of the cost of maintenance and operation of each zone on the same basis as its payment of the amount of rental specified in Section 28 allocated to such zone, subject, however, to the provisions of Section 18. * * *"

Basically, all that is said here is that maintenance and operation costs will be borne by the railroads in the same proportion as they pay rental (imposed on them by Section 28). The next section reiterates that both rentals and expenses of operation shall be apportioned in relation to the use the respective carriers make of each "zone" of the facility:

"Section 35. A. The amount of the Normal Rental specified in Section 28 and Section 29 which is allocated to the zones referred to in Section 27, and the cost of maintaining and operating (except as in this section otherwise provided) the Union Passenger Terminal shall be apportioned among the Carriers (other than Chicago, St. Louis and New Orleans Railroad Company, Texas Pacific-Missouri Pacific Terminal Railroad of New Orleans and New Orleans Terminal Company) in proportion to their respective uses of the respective zones on the following bases: * * *"

What follows is simply a detailed statement of how the proportionate use of each zone is to be computed, with a provision in each case that a minimum use will be assumed even though the actual count for a particular carrier falls below that number. Except as Section 35B, discussed later, may shed some light, neither Section 34 nor 35 illuminates the problem here. Nothing is expressly said about what happens when a carrier entirely discontinues operations in this area.[2]

---

**2.** Contrary to plaintiffs' assertion, the use of the unqualified word "Carriers" in the two sections does not answer the question. For, though every railroad signatory to the contract, including GM&O, remains a "carrier" within the meaning of the agreement, in any given provision that term embraces all the signatories

Confronted with the silence of the agreement, the parties take predictably divergent positions. Plaintiffs maintain that every subscriber must contribute toward maintenance of the terminal for the full 50-year term regardless of its withdrawal unless it is expressly relieved of that obligation, and concludes that since there is no such stipulation in GM&O's favor, it remains bound. Defendant, on the other hand, argues that in the absence of express language to the contrary, a carrier is only obligated so long as it continues to use the terminal and, accordingly, reads the omission of such a provision with regard to maintenance expenses as a favorable sign. Thus, the case really turns on a question of presumptions: Under the contract, is continuing liability to be presumed or not?

■■ The answer is not seriously in doubt. In the first place, even if there were no internal evidence pointing that way, the most natural assumption would be that each carrier intended its obligation to be extinguished when all benefits to it ceased. Certainly, without express direction, it would be improper to sup-

pose a requirement under which the parties must continue paying the cost of operating a facility which they no longer use. For the "most congruous" result is always to be presumed and the intention to impose harsh and inequitable burdens is never to be implied. See LSA–C.C., Arts. 1952, 1964, 1965; Lochte v. Maggiore, 19 La.App. 362, 139 So. 750.[3] Those principles seem particularly apposite here where the whole scheme of the agreement is that each carrier shall contribute in proportion to its use of the terminal, every payment required under the contract being apportioned in more or less strict adherence to this rule.[4]

■ But the decision need not rest on general principles alone. Disregarding more doubtful hints,[5] there is one provision of the agreement which convincingly reveals the intent of the parties that, as a general matter, discontinuance of service to this area would relieve a carrier of its contract obligations. It is the exception which proves the rule. The provision in question is Section 30D which expressly stipulates that "If any Carrier shall entirely discontinue conducting passen-

---

only if "the context" does not "indicate a lesser number," which is the precise question here. See "Definitions" (5).

3. Perhaps unnecessarily, the contract expressly provides that the law of Louisiana shall govern. Section 87.

4. It is true that the basis for the division of the charges is not always *actual* use. Thus a carrier which serves the New Orleans area but, contrary to its undertaking, boycotts the terminal, will be "deemed" to have used the facility to the extent of its passenger traffic here and billed accordingly. Section 18C. And certain arbitrary charges are established for those whose actual use of a zone falls below the prescribed minimums. Section 35A(i), (ii), (iii) and (iv). But neither of these exceptions destroys the basic principle of the contract that costs are to be shared in accordance with use. Indeed, the fictive use imputed to the carrier which should but does not actually use the facility expressly applies only "so long as it conducts passenger train operations into or out of the New Orleans District," and the minimum use taxed against those whose business falls

below anticipated levels is demonstrably applicable solely to railroads which, in whatever small degree, continue to actually use the terminal.

5. One such indication is the provision of Section 18C that a carrier which has passenger operations in this area and does not actually use the terminal will be charged as though it did, but only "*so long*" as those operations continue. This is said to justify the inference that after passenger service to New Orleans ceases altogether, nothing further is due, except as expressly otherwise provided.

It might also be argued that the reference in Section 5F to a possible decrease in the membership of the Terminal Committee, made up of City officials and one representative from each signatory railroad, implies that a discontinuing carrier loses its place on the Committee, a result which is justifiable only if the withdrawing member is released of its obligations. On the other hand, it may be that this provision applies only after the expiration of the original term of the contract, renewal at that time being optional with each carrier. See Section 79A.

ger train operations into and out of the New Orleans District," it shall nevertheless "continue for the remainder of the original term of the agreement to pay [a] share of the rental" commensurate with its past operations. The provision is unique. It is the only explicit statement of an obligation which continues after complete discontinuance of passenger service to New Orleans. This alone reveals its character as an exception to a general rule that would produce a different result.

But that is not all. Section 30D also makes clear that the minima of Section 35A do not establish a similar exception for maintenance and operation expenses. Immediately apparent is the sharp contrast between the two dispositions. The insertion of a separate section particularly governing the payment of rentals after withdrawal from the terminal indicates that a special express provision is necessary to establish a continuing obligation, and certainly the stipulation of minima in Section 35A, included primarily to serve another purpose, cannot be so characterized. But the more compelling demonstration lies in this: since the minima of Section 35, when applicable, affect the apportionment of *rental*, as well as maintenance expenses, they cannot have been intended to impose a charge on carriers which have altogether discontinued passenger service here, else the obligation to continue paying rent would already be imposed and Section 30D would be superfluous. The suggestion that the minima apply to railroads which have wholly withdrawn from the area *for the purpose of computing their*

*share of operation expenses,* but do not apply to them *in the apportionment of rental,* is not persuasive. Section 35 makes no such distinction and there is no warrant for supposing it, especially considering the incongruous result that would follow.[6] The plain fact is that the minima of Section 35 were inserted only to assess a minimum charge against carriers which continued to use the terminal and have no application to those which have altogether withdrawn.

This conclusion, of course, decides the case. Deprived of the minima provisions of Section 35, plaintiffs can point neither to a stipulation imposing continuing liability for maintenance and operation expenses after withdrawal nor to one indicating the basis on which such a liability would be assessed. It is therefore not surprising to see them reluctant to let go of Section 35. Rather desperately, they cling to its more obscure provisions and claim to find there a firm seat for their contention. Three clauses are invoked. Each will be examined in turn.

The first provision from which special meaning is sought to be extracted is a meager parenthetical exclusion. It occurs in the initial paragraph of Section 35A, already quoted, which provides that rental and operating expenses shall be apportioned in accordance with their respective use of the terminal "among the Carriers (other than Chicago, St. Louis and New Orleans Railroad Company, Texas Pacific-Missouri Pacific Terminal Railroad of New Orleans and New Orleans Terminal Company)." The argument follows the classical pattern: the express exception made in favor of the

6. Under Section 30D(i) a carrier which entirely discontinues operations within six months after the opening of the terminal is assessed rentals on the basis of its "Test Period Percentage," which is computed on its passenger business for the six-month period immediately preceding the effective date of the agreement. See Section 18D. In the case of most railroads, if not all, this would result in a higher rental charge than is imposed by application of the minima of Section 35A. Thus, a discontinuing carrier normally pays more by way of rental than one who

still uses the terminal in a minimal way; but, being exempt from contributing toward operation costs, its *total charge* will normally be less. On the other hand, if plaintiffs' position were accepted and a withdrawing railroad remained bound for a minimum contribution to maintenance and operation expenses, we would be confronted with the anomaly of a carrier which has entirely vacated the terminal burdened with a share of the total obligation larger than that of others which continue to derive some benefit from the facility.

three signatories can only be explained on the assumption that under the contract they would otherwise have been bound to contribute toward these charges on the basis of the minima established by Section 35, and, since these railroads have no passenger service to or from New Orleans, it follows that these minima may be applicable to some carriers which have no local operations; then, generalizing from a particular instance, it is asserted that the minimum charges of Section 35 are assessable against all signatory railroads without passenger traffic to this area, which inevitably leads to the conclusion that GM&O, being of this number, remains obligated to contribute toward the cost of maintaining the terminal.

■■ There are flaws enough in the reasoning. But, were it faultless, it could only prove the limits of geometric logic, mechanically applied.[7] Sometimes words will not yield up their true meaning to analysis and the right construction, in the phrase of Mr. Justice Holmes, "is to be felt rather than to be proved." [8] This is such a case. Here the formal demonstration defies common sense.

Indeed, even without the exclusion, no one could reasonably maintain that these railroads, which apparently do not, and never did, operate passenger service to New Orleans, would be bound to contribute under an agreement which contemplates that everyone pays in accordance with his use of the facility. And, if that is so, then obviously nothing can be inferred from the explicit exception. The parenthetical exclusion is too casual to support a negative pregnant, especially one that would impose a heavy and unusal obligation. In this context where words are not spared, it is difficult to suppose that the affected carriers would be content with a passing reference to their exemption from liability if they were not already relieved.

Evidently, the clause was inserted merely out of abundance of caution. To borrow the words of Mr. Justice Lurton, while Circuit Judge, in Employers' Liability Assur. Corp., Limited, of London, England v. Morrow, 6 Cir., 143 F. 750, 756–757:

"If this exception had been omitted, the provision could not possibly have applied to the cases mentioned in the exception. The exception did not, therefore, operate to take out of the proviso something which, but for the exception, would have been included. Its presence, therefore, cannot under such circumstances bring within the proviso a claim which would not have been within the proviso if the exception had been omitted. The ordinary office of an exception or proviso is to take special cases out of a general class or to guard against misinterpretation. Experience shows, however, that they quite frequently are introduced from excessive caution, in such cases operating only to bring confusion. * * *

"We therefore reach the conclusion that the intrusion of an exception which did not operate to exclude from the contract something otherwise included has no important bearing upon the construction of the clause in which it is found. * *"

The next two provisions relied on form paragraph B of Section 35. The first of these reads:

"(i) If Guy A. Thompson, Trustee, Missouri Pacific Railroad Company, Debtor, should (1) discontinue operation of passenger trains into and out of the New Orleans District

7. Mr. Justice Frankfurter has written: "The process of construction, therefore, is not an exercise in logic or dialectic: The aids of formal reasoning are not irrelevant; they may simply be inadequate." Some Reflections on the Reading of Statutes, 47 Col.L.Rev. 527, 529. While these remarks were directed to the interpretation of statutes, they are equally applicable to the construction of contracts which "have the effect of laws on those who have formed them." LSA–C.C., Art. 1901.

8. United States v. Johnson, 221 U.S. 488, 496, 31 S.Ct. 627, 55 L.Ed. 823.

and such traffic is turned over to any other Carrier, or (2) if such traffic be consolidated with that of any Carrier in a joint passenger train operation, then and in either of such events, the obligation of said Guy A. Thompson, Trustee, Missouri Pacific Railroad Company, Debtor, with respect to maintenance and operation under the provisions of Paragraph A of this section shall cease."

The argument here, of course, is that the express exemption from continuing liability for maintenance expenses made in favor of the Missouri Pacific in the event it discontinues operations implies a general rule which would impose the obligation on other carriers. This is the same contention we have just examined, but, because in this instance the provision is set out at length, in specific terms, it cannot be dismissed in the same summary fashion. Here we are confronted with what seems clearly a bona fide *exception*. The only question is whether it exempts Missouri Pacific from a continuing liability generally imposed on all discontinuing carriers, as plaintiffs maintain, or announces an exception to another rule of the contract.

The key to the problem is in the insertion of the words "and such traffic is turned over to any other Carrier, or (2) if such traffic be consolidated with that of any Carrier in a joint train operation." The provision covers only discontinuance of operations by the named railroad *when its traffic is taken over by another carrier*. In that event, Missouri Pacific will be relieved, and the new carrier will assume the obligation. Nothing is said about the

case of Missouri Pacific's abandonment of passenger service to this area where no one fills the gap and the traffic ceases completely. Thus, the provision appears as one shifting responsibility for the *same operation when the management changes*. The point decided is merely *who* shall pay, not whether the obligation to contribute toward maintenance costs continues after operations cease altogether. This alone shows that the sub-paragraph is not the clear exception plaintiffs suggest. But there remain some gnawing doubts about why the provision was inserted.

First, there is some difficulty in asserting that the purpose of the provision is to shift the obligation from the Missouri Pacific to the new handler of its local traffic. Indeed, the assumption of responsibility by the other carrier is not expressly stated here. Certainly it is understood, but the obligation does not result from this provision; it is imposed elsewhere.[9] Therefore, the only real function of the sub-paragraph is to *relieve* Missouri Pacific. But, if every carrier who discontinues operations is excused from further payments toward maintenance of the terminal under the general rule of the agreement, why a special exemption for the case where the abandoned traffic is taken over by another railroad? Second, why is Missouri Pacific singled out for special treatment?

The answer probably lies in Section 80 of the contract which governs the liability of the parties when the traffic of a carrier continues to flow in and out of the terminal but is turned over to the management of another railroad.[10] In

9. Section 80A provides: "If any Carrier shall at any time hereafter merge or consolidate with any other railroad or railroads, whether or not such other railroad or railroads be party or parties to this agreement, the succeeding corporation shall succeed to all rights and be bound by all obligations of the merging or consolidating Carrier under this agreement."

Paragraphs B and C of the same Section make every sale, lease or other transfer of the right to use the terminal

contingent upon the transferee's assumption of liability.

10. Surprisingly, defendant does not mention Section 80. It relies instead on Section 18 and the particular provisions of Section 35A which assess each carrier on the basis of cars or other elements moved or handled "for its account." But that expression is at best ambiguous. Whether the traffic is chargeable to the account of the assignor or the assignee depends, it would seem, on whether the parties have rec-

that case, even though the new handler has assumed the obligation, the former carrier is not relieved until and unless all the signatories to the contract have accepted the novation. Section 80C and E. Does that result affect the conclusion that the maintenance obligation of every carrier ceases when its traffic ceases? At first, it seems a strange rule which would excuse without ado the signatory who altogether quits but imposes onerous conditions on the carrier which merely assigns its business and furnishes the terminal with another obligor. Yet, on closer analysis, the distinction makes sense. Indeed, the basic scheme of the contract is that the *traffic* shall defray the cost of operations. When a part of it ceases entirely, obviously no one can be held accountable for what no longer exists. But when the traffic is merely transferred, it remains assessable, and it is a fair condition that the former handler be relieved of liability only if the others concerned are satisfied that the

assignee is a good risk and not likely to default on his obligation.

The need for the provision is now clear. Missouri Pacific, which was apparently contemplating an arrangement with its subsidiary, Texas Pacific,[11] wanted to avoid the requirement of Section 80. In effect, it was here given advance consent to an assignment or consolidation.[12] That explains why nothing was said concerning a complete cessation of Missouri Pacific's traffic. The provision simply was not dealing with that contingency, which was governed by the general rule already stated.

Finally, plaintiffs invoke the second sub-paragraph of Section 35B which provides:

"(ii) In the event that the traffic of the New Orleans, Texas & Mexico Railway Company is no longer handled into and out of the New Orleans District over the lines of the Illinois Central, then and in that event the

---

ognized the assignment. And this, in turn, appears to be governed by the rules announced in Section 80, under which, except in the one instance of a sale in reorganization followed by liquidation of the assignor, the assigning carrier remains obligated until all parties to the contract agree to release it and accept the undertaking of the assignee instead.

11. The indication that such a transfer was envisaged is contained in a similar provision exempting Missouri Pacific from rental payments after it ceased handling its own local traffic. See Section 30D(ii). There the contingency is stated with specific reference to the Texas and Pacific as the assignee. No explanation has been given why that provision is so limited while Section 35B(i) in terms covers a transfer to any other carrier. But the rental provision at least shows that an arrangement between the parent and subsidiary was contemplated.

It will also be noticed that Section 30A(ii), unlike its counterpart applicable to maintenance expenses, explicitly states that the transferee shall assume the obligation from which Missouri Pacific is relieved. At first glance, this seems unnecessary in view of the other provisions already referred to (see Note 6, supra). However, a close reading of

sub-section (b) reveals that, in this instance, the obligation is assumed retroactively. Since, under certain circumstances, this would impose a greater liability than would otherwise inure to the assignee, there is reason enough for the provision. Fortunately, it is not necessary to probe the mystery why the same disposition for retroactive assumption of liability was not copied into Section 35.

12. This may seem a strange place to insert a clause with such a limited application. It might have been more appropriately included in Section 80. But a careful examination of the agreement will convince any reader that its internal organization is far from logical and that no significance can be drawn from the position of a particular clause. Section 30A(ii), supra n. 11, is a sufficient example. Why was not that provision inserted here, in Section 35, which deals with the apportionment of both rental and operation costs? Or, better still, why were the two provisions not combined? Or, if for some hidden reason separate dispositions were desirable, why was this provision dealing only with maintenance expenses not included in Section 34 which is limited to that subject?

obligations of said Illinois Central attributable to such traffic, under the provisions of Paragraph A of this section, shall cease."

The same arguments are made here. It is said that the special provision relieving the Illinois Central of future payments on account of the traffic of the New Orleans, Texas & Mexico after it stops handling that traffic raises an inference that other discontinuing carriers remain bound. But, again, the fallacy of the reasoning is demonstrated if we understand that the sole, or at least principal, function of this sub-paragraph, like its predecessor, is to determine *who* shall pay the charges attributable to *traffic which,* though handled under a different arrangement, *continues to flow through the terminal.* In this instance, it is true, the exemption is not in terms so limited: literally, it relieves Illinois Central of the obligation whenever that company stops handling the traffic over its lines, regardless of whether another carrier takes its

place or the traffic ceases altogether. But the provision clearly covers the situation in which other lines are made available to handle the business of the New Orleans, Texas & Mexico and that is enough to require its insertion. It does not matter that because of the broad language used the exception also incidentally and unnecessarily reiterates a result already announced elsewhere.[13]

The importance of the provision in the case of a continuance of the New Orleans, Texas & Mexico traffic is obvious. For some reason undisclosed, this railroad did not become a signatory to the contract and the Illinois Central agreed to assume its obligations. The traffic of the former was charged to the latter for all purposes. But, quite naturally, the Illinois Central was content to continue this undertaking only "so long as traffic of the New Orleans, Texas & Mexico Railway Company is handled over the lines of the Illinois Central." Section 30D(iii).[14] If that arrangement ceased and another

13. Even without invoking the general rule that a discontinuing carrier is exempted from further contributions to maintenance and operations costs, it is easily demonstrable that this provision was wholly unnecessary to relieve the I.C. of maintenance payments attributable to the New Orleans, Texas & Mexico in the event that traffic ceased altogether. Indeed, since the cars of the New Orleans, Texas & Mexico were charged to I.C., a discontinuance of that traffic would automatically reduce I.C.'s count and its resulting obligation. And, even in the unlikely event that I.C.'s business fell below the minima of Section 35A, it would not be penalized under plaintiffs' theory, for I.C. could only be held to pay the minimum charge once.

A comparison of this provision with its counterpart in the section dealing with rental affords a further indication of the same point. Indeed, Section 30D(iv) (a) expressly provides for the case where the traffic of the New Orleans, Texas & Mexico ceases altogether, stipulating that the rental thus lost will be made up by the signatory carriers in proportion to their respective use of the terminal. This is in accord with the principle of the contract that the *rental* obligation continues even after traffic ceases. Why was not a similar provision

inserted in Section 35? Obviously because maintenance and operation costs are always attributable to actual traffic, so that when the movement ceases altogether the related obligation is automatically extinguished and there is no occasion to prescribe a formula for re-apportionment.

Subdivision (b) of the same sub-paragraph is clearly superfluous and that is reason enough to dismiss any doubts about why it is not repeated in the provision of Section 35 dealing with the traffic of the New Orleans, Texas & Mexico Railway. It was apparently inserted here merely for the sake of symmetry. Having provided for the case of a complete cessation of the traffic, it was thought proper also to state the result in the event of a transfer of that traffic.

14. It might be argued that the quoted phrase prefacing the Illinois Central's undertaking is sufficient of itself to relieve that company of any liability for New Orleans, Texas & Mexico traffic after its lines cease to be used. But, at best, that qualification raises an inference of relief for the future and the Illinois Central evidently preferred not to leave the question dangling. In view of some of the conclusions reached here, they were probably wise in thinking an express provision necessary.

carrier supplied its lines for this traffic (and received the payments due for that service), the Illinois Central wished to be relieved of further liability on this account. That is precisely the function of the sub-paragraph under consideration.[15]

Thus, none of the provisions relied on affects our former conclusion: the rule of the contract is that a carrier which entirely discontinues operations in the New Orleans District is, for the future, excused from all payments except only rental.[16]

It follows that, since March 8, 1954, when it entirely abandoned its passenger service to this area, GM&O has owed nothing under the contract on account of maintenance and operation expenses of the terminal, additions and betterments thereto, or the cost of purchase, rental or maintenance of switching locomotives, and, subject to a possible contingent liability under Sections 33D, 34D and 44C, which is not here adjudicated,[17] this exemption will continue so long as it does not resume passenger train operations in the New Orleans District as defined in the agreement. As plaintiffs concede, this conclusion requires reimbursement to defendant of the payments made by it under protest on these accounts since withdrawal from the terminal, which total $135,876.91. Each of the plaintiffs will therefore be condemned to pay to defendant such portion of this amount as would have been assessed against it under the contract had GM&O not made these contributions.

Judgment accordingly.

15. It will be noticed that sub-paragraph (ii) of Section 35B, unlike sub-paragraph (i) which only relieves the named carrier of its "obligations * * * *with respect to maintenance and operation* under the provisions of Paragraph A," provides that the "*obligations* of Illinois Central attributable to such traffic, under Paragraph A of this section shall cease." Since Paragraph A of Section 35, alluded to, governs the apportionment of both rental and operation costs, it could be maintained that the unqualified exemption in the sub-paragraph under consideration excuses the I.C. from both obligations. However, in view of sub-paragraph (iv) of Section 30D which specifically relieves the Illinois Central of the continuing obligation to pay rental in the same contingency, it is more likely that the broad language in Section 35B(ii) was inadvertent. But, in any event, since the Section 35 provision was necessary to relieve the carrier from further liability for maintenance on account of the New Orleans, Texas & Mexico traffic, it does not matter whether the inclusion of an exemption from rental payments on this account was deliberate or not.

16. While the contract seems to expressly require of a discontinuing carrier continued payment of "Normal Rental" only (see Section 30D), defendant has here admitted its obligation to continue paying the "Unadjusted Prepaid Additional Rental" imposed under Section 7F and the "Adjusted Prepaid Additional Rental" of Section 7G, if any, and there is no occasion to consider the basis for these concessions. Accordingly, the judgment will grant only the relief prayed for, without considering these items of additional rental.

17. Despite the promise of Section 6 that obligation in solido will be the exception rather than the rule, it appears that each carrier signatory to the contract has undertaken to guarantee in full all payments due by any of them to the terminal. Presumably, this solidary obligation operates only in the event of default by one or more of the railroads, and any payments made under that compulsion over and above the payor's proper share may be recouped from the defaulting carrier. See Section 33D. But, in any event, that liability runs in favor of the Union Passenger Terminal, the Public Belt Railroad Commission or the City of New Orleans, none of which are parties to this litigation, and cannot be invoked in this proceeding. Accordingly, there is no occasion here to consider the effect of the cited provisions and no opinion on the existence or extent of such a liability is intimated.