**ILLINOIS CENTRAL RAILROAD COMPANY et al., Appellants,**

v.

**GULF, MOBILE & OHIO RAILROAD COMPANY, Appellee.**

**No. 18975.**

United States Court of Appeals
Fifth Circuit.

Oct. 2, 1962.

Rehearing Denied Nov. 6, 1962.

Harry McCall, Jr., New Orleans, La., for appellants.

Charles J. Rivet, John C. Foster, New Orleans, La., for appellee.

Before RIVES, CAMERON and BELL, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from a summary judgment "declaring that, since March 8, 1954, Gulf, Mobile and Ohio Railroad Company has owed nothing under the 'Agreement providing for the Construction and Use of a Union Passenger Terminal in the City of New Orleans and the Elimination of Various Grade Crossings and the Abandonment, Rearrangement and Relocation of Railroad Facilities,' dated October 22, 1947, on account of maintenance and operation expenses of the terminal, additions and betterments thereto, or the cost of purchase, rental, operation or maintenance of switching locomotives, and that subject to a possible contingent liability under Sections 33D, 34D, and 44C, which is not here adjudicated, this exemption will continue so long as Gulf, Mobile and Ohio Railroad Company does not resume passenger train operations in the New Orleans District as defined in the Agreement."

The judgment also ran in favor of the Gulf, Mobile & Ohio Railroad Company (hereafter GM & O) against the plaintiff carriers for the sum of $135,876.91 which the GM & O had paid under protest on its disputed liability from April 16, 1954 to June 16, 1958.

The judgment was entered pursuant to a thoroughly considered and full opinion of the district judge, which is reported at 191 F.Supp. 275. That opinion explored in detail practically every argument of the respective parties, and properly conceded that, "the case turns wholly on the interpretation of certain clauses of the contract." [1] Since this Court is in as good position to interpret the 190-page written contract as was the district court, we cannot rely upon the clearly erroneous rule, but must ourselves construe the contract without any presumption in favor of the judgment of the district court. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.; Galena Oaks Corporation v. Scofield, 5 Cir., 1954, 218 F.2d 217.

Fully appreciating that responsibility, we have held the case an unusual length of time in order to have an opportunity,

[1] And, we may add, of the contract as a whole, though we are convinced that the district judge clearly so understood.

as a part of our heavy schedule of work, to study and understand the voluminous contract and the opposite contentions of the parties as to its proper interpretation. Now having completed that task, we have been led irresistibly to the same conclusion as the learned district court. Since the decision turns entirely on the peculiar wording of a particular written contract, and is of little value as a precedent, we do not in this opinion set forth our interpretation of all of the detailed provisions of the contract, a task which the district court has performed so ably, but content ourselves with a simple statement of the controlling considerations which lead to our judgment of affirmance.

Sections 33D, 34D and 44C of the contract, which were not construed by the district court, relate to the obligations of the carriers to the City of New Orleans and to the Public Belt Railroad Commission, an agency through which the City acted pursuant to an amendment to the State Constitution. The City and the City acting through the Commission are the parties of the first and second part to the written contract but they are not made parties to this litigation. In the complaint and answer the carriers agree that neither the City nor the Commission "has any interest in the present controversy between plaintiffs and defendants." The sole question to be determined is the apportionment among the parties of the third part to the contract, the carriers inter sese, of the maintenance and operating expenses of the Union Passenger Terminal, and more specifically whether the GM & O, which ceased all passenger train operations on March 8, 1954, about a month before the terminal opened for use on April 16, 1954, is nonetheless obligated to contribute to the cost of maintaining and operating the terminal for the term of 50 years from the "completion date" of the terminal, the period of duration of the written contract.

If the GM & O remains obligated to contribute to the maintenance and operation of the terminal after its discontinuance of passenger operations in New Orleans, that obligation must be imposed by the terms of the written contract. The only provisions of that contract which deal specifically with the obligation to contribute to maintenance and operation costs of the terminal are Sections 34 and 35.

Section 34 is certainly no more definite than Section 35 in creating such an obligation. It does obligate all of the carriers, jointly and in solido, to guarantee the payment of the entire cost of the maintenance and operation of the terminal. The GM & O does not in this action dispute its guarantee to the City of New Orleans and to the Commission of such costs.

Section 35 is captioned, "Apportionment of Normal Rental and Operating and Maintenance Cost Among Carriers." Section 35 is the part of the contract in which one would expect to find the obligation of a carrier to continue to contribute to the costs of maintaining and operating the terminal after it has discontinued passenger operations in New Orleans, if any such obligation is imposed by the contract. The nearest Section 35 comes to dealing with that subject is in detailed provisions for apportionment among the carriers in the event of minimum uses of different zones of the terminal. Unless a contrary intention were indicated by other provisions, it could reasonably be argued that the provisions for minimum uses fix the measure of contribution to be made in the event of an entire cessation of use.

Those provisions, however, as is indicated by the caption, cover the measure of apportionment among the carriers both of the Normal Rental and of the Operating and Maintenance Cost. As to Normal Rental, there are express provisions in Section 30D of the Contract for the share of a carrier's contribution after the carrier has entirely discontinued passenger train operations into and out of the New Orleans District. Nowhere in the contract are there any corresponding express provisions as to operating and maintenance costs in such an event.

Thus, if Section 30D clearly shows that the minima provisions of Section 35 were

not intended to include the event of an entire cessation of use as applied to Normal Rental, there is the strongest sort of indication that those provisions were not intended to include the event of an entire cessation of use as applied to costs of maintenance and operation.

The plaintiff carriers concede that the minima provisions of Section 35A apply both to Normal Rental and to Maintenance and Operating Cost, but argue that only the provisions as to Normal Rental are limited by Section 30D to the situation of actual operation. It is their position that a carrier discontinuing passenger service must contribute both to Normal Rental and to Maintenance and Operating costs, but that the formulae for determining the amount of such contributions are different.

■ It is clear, however, that Section 30D shows that the draftsmen of the contract did not overlook the event of **a** carrier's complete discontinuance of passenger operations, but expressly provided that in such an event, the discontinuing carrier should continue to pay a share of the Normal Rental. The costs of maintenance and operation of the terminal could be expected to be several times larger than the Normal Rental. For example, during the year 1959, the GM & O paid as its share of Normal Rental the sum of $12,451.14, and was billed for a proportionate share of maintenance and operating costs in the sum of $37,696.22. Any obligation for apportionment of either Normal Rental or of Costs of Maintenance and Operation upon a carrier which entirely discontinued passenger train operations would continue for the duration of the contract, 50 years from "completion date." That obligation was so important in the case of Normal Rental that it was expressly provided for in clear and unmistakable language. We cannot believe that a much larger obligation to continue to contribute to the costs of maintenance and operation was left to be deduced or implied from doubtful provisions of the contract, which might reasonably be argued either to include or to exclude the event of a carrier's complete cessation of passenger operations.

We have not overlooked the arguments based on various detailed provisions of the contract. Those arguments have been sufficiently covered in the able opinion of the district court. We are convinced that as among the carriers, the contract imposes no obligation on one which has discontinued passenger operations to contribute to the maintenance and operation costs of the Passenger Terminal. The judgment of the district court is therefore

Affirmed.

CAMERON, Circuit Judge, dissents.

Rehearing denied; CAMERON, Circuit Judge, dissenting.