Freddie EATON et al., Plaintiffs-Appellants,

v.

COURTAULDS OF NORTH AMERICA, INC., et al., Defendants-Appellees.

No. 76-2457.

United States Court of Appeals, Fifth Circuit.

Aug. 9, 1978.

J. U. Blacksher, Mobile, Ala., Jack Greenberg, O. Peter Sherwood, New York City, for plaintiffs-appellants.

Paul W. Brock, Benjamin T. Rowe, William C. Tidwell, III, Mobile, Ala., for Courtaulds.

Otto E. Simon, Mobile, Ala., for Local 1465, etc.

John C. Falkenberry, Birmingham, Ala., Arthur Goldberg and Linda M. Nelson, A.C.T.W.U., New York City, for Textile Workers Union of America.

Before CLARK and GEE, Circuit Judges, and LYNNE,[*] District Judge.

GEE, Circuit Judge.

This appeal revolves around the interpretation of one section of a consent decree entered into by the parties and accepted by the district court in 1973.

The consent decree in question settled the claims of a group of black employees who had initiated an action under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, et seq., against Courtaulds of North America and against the local and national units of the Textile Workers Union of America. Among other things, the black employees had contended that the defendants maintained a discriminatory promotional and seniority system. This, they said, was due in part to the past practice of segregated job classifications under which black employees had been placed in undesirable labor classifications only; although by the time of the lawsuit black employees had gained the right to transfer, they could do so only at the cost of their seniority. This in turn was because under the collective bargaining agreement between the union and Courtaulds, seniority was reckoned by service within particular sections or "lines of progression," rather than by an employee's total length of service with the company. When one departed one "line" to enter another, then he began in the new "line" with no seniority, and that regardless of how long he had been employed at the *plant.*

[*] Senior District Judge of the Northern District of Alabama, sitting by designation.

Whatever the truth of those allegations, the parties did arrive at the 1973 settlement agreement that purported, among other things, to solve these problems of seniority. For seniority purposes the agreement set out special provisions for an "Affected Class" of 57 named black employees who had been hired in the "labor section" before October 21, 1968, and provided that, subject to certain specific limitations, the "Affected Class" members would be entitled to what was called "Court Seniority" in connection with promotions, demotions and layoffs. This "Court Seniority" was defined by the employee's length of continuous service with Courtaulds.

The present controversy concerns the application of the settlement agreement's "Court Seniority" clauses in the context of a reduction in force. The paragraphs under dispute are the following:

[VII.]D. 1. When members of the Affected Class compete with each other or with employees not of the Affected Class as to layoff, demotion and recall, Court Seniority shall be the applicable seniority for such purposes and may be utilized by Affected Class employees and any other employees so competing. Court Seniority for the purposes of demotion, layoff and recall shall not be lost by failure either to bid or to accept an entry level job as is set forth in preceding Paragraph "C".

2. Subject to the express exception in Paragraph III. (F) above, an Affected Class employee or any other person can only use his Court Seniority in case of demotion, layoff or recall *from his position in the line of progression in which he is as of the date of this Settlement Agreement downward to the entry job in that same line of progression.* He can at no time use Court Seniority to jump from section to section or from department to department.

(Emphasis added).

The entire case hinges on the referent of the prepositional clause beginning with "in

which" in the emphasized portion: if this clause modifies "position," one result emerges; but if it modifies "line of progression," it has quite a different meaning. At the time this controversy arose the company and the union read the "in which" clause to modify "position." On this reading the company could, at the time of a layoff, bump each Affected Class employee back to the position he had occupied at the time of the 1973 agreement, and the employee could only apply his Court Seniority to avoid further drops in position. Each of the appellants had transferred to the Spinning Department prior to the 1973 settlement, and each had used his Court Seniority in that line of progression to advance to a job position higher than that to which he would have advanced under ordinary section seniority. But when a reduction in force occurred in 1974 the company, applying its interpretation of paragraph VII.D.2. of the agreement, bumped each plaintiff back to his pre-settlement position in the Spinning Department.

The plaintiffs contested this procedure, arguing that it was based on a misreading of paragraph D.2. They contend that the "in which" clause modifies "line of progression" rather than "position." On this reading the Affected Class members, in case of a reduction in force, should be able to apply Court Seniority to protect themselves in the new positions they have attained as a result of the settlement, without first being bumped back by section seniority to their pre-settlement positions. The company's interpretation, they argue, turns paragraph D.2. into an exception that virtually swallows the rule of Court Seniority as applied to layoffs by paragraph D.1. Upon their demotions the plaintiffs filed grievances. These were denied, and an arbitrator decided in favor of the company, unaccountably finding no ambiguity in the disputed clause.[1] Meanwhile, appellants applied to

---

1. These matters were referred to arbitration in accordance with Article IX of the settlement agreement, which provides that "any dispute or disagreement arising under this Settlement

Agreement involving matters governed by the Collective Bargaining Agreement as it may be modified by the Settlement Agreement shall be referred for resolution to the grievance process

the district court for a declaration of their rights and enforcement of the settlement agreement. The district court, like the arbitrator, determined that the phrase in question was not ambiguous and that the defendants' interpretation was correct.

■ We reverse. We note preliminarily that we are not bound by the clearly erroneous standard of review of Federal Rule of Civil Procedure 52(a).[2] The Supreme Court has said that "since consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts," *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975), and this court has observed that the contractual aspects of a consent decree exist "chiefly . . . in regard to disputes concerning what the parties actually consented to as reflected by the judgment in question." *United States v. Kellum,* 523 F.2d 1284, 1287 (5th Cir. 1975). The present issue thus should clearly be treated as a matter of contractual interpretation. It has been frequently stated, however, that the interpretation of the written language of a contract is a matter of law and is reviewable as such. *See, e. g., First National Bank of Miami v. Insurance Co. of North America,* 495 F.2d 519 (5th Cir. 1974); C. Wright & A. Miller, Federal Practice & Procedure: Civil, § 2588. The reason was stated in our opinion in *Illinois Central Railroad Co. v. Gulf, Mobile & Ohio Railroad Co.,* 308 F.2d 374, 375 (5th Cir. 1962):

Since this Court is in as good position to interpret the . . . written contract as was the district court, we cannot rely upon the clearly erroneous rule, but must ourselves construe the contract without any presumption in favor of the judgment of the district court.

Thus, our review of the district court's interpretation of the consent decree's language is comparable to review of a district court's contract interpretation and is not restricted by the clearly erroneous rule of F.R.Civ.P. 52(a); the matter may rather be considered afresh by this court as a matter of law. *See Kimbell Foods, Inc. v. Republic National Bank,* 557 F.2d 491 (5th Cir. 1977).

■ If possible, we are required to analyze a contract's meaning by its language without resort to extrinsic considerations. This is because the language of an agreement, unless ambiguous, represents the parties' intention. *Kimbell, supra* at 496. Of settlement agreements in particular, the Supreme Court has said that:

[T]he agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.

provided by the Collective Bargaining Agreement in effect at the time in question. . . ." This article does not explicitly make the arbitrator's decision binding on the parties; moreover, the settlement agreement explicitly provides that the district court—which initially heard the litigation and accepted the settlement—was to retain jurisdiction over the agreement. We think that the district court correctly treated this enforcement action as one requiring de novo review by the court. Such review appears to be contemplated by the settlement agreement. In addition, while the settlement agreement casts the case in a different light from an initial Title VII action, there are certain analogies to such an action. Here, too, the appellants' nondiscrimination rights are governed in large part by a legal document, here the settlement agreement, that is indepen-

dent of the collective bargaining agreement. Deferral to the arbitrator's decision would raise at least some of the same difficulties that could be raised in deferral to arbitration in a Title VII suit, due for example to the different nature of the arbitration forum and possible conflicts of interest between the grievants and their union representatives in arbitration proceedings. *See Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 55–60, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

2. Since this issue involves interpretation of the language of an existing settlement, rather than the initial acceptance of a consent decree as fair to the parties, the district court's exercise of discretion is not in question, and we do not review for abuse of discretion.

For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). Where ambiguities exist in the language of a consent decree, the court may turn to other "aids to construction," such as other documents to which the consent decree refers, as well as legal materials setting the context for the use of particular terms. *ITT Continental Baking, supra,* 420 U.S. at 238–43, 95 S.Ct. 926.

We are puzzled by the district court's stated view that the syntactically opaque language of clause VII.D.2 is "not ambiguous," but we think that the district court was correct in attempting to construe this clause in the light of other portions of the agreement. We disagree, however, with the district court's ultimate construction of the phrase. That interpretation focused on the opening clause of paragraph VII.D.2, "Subject to the express exception in Paragraph III.(F) . . . ." This clause refers to the ten named members of the Affected Class who had not yet transferred at the time the settlement agreement went into effect; paragraph III.F entitled them to transfer within thirty days after the settlement without forfeiting Court Seniority in the new section. The district court reasoned that since this group of ten employees was excepted from the operation of paragraph VII.D.2, these ten had full Court Seniority for purposes of demotion, as provided in paragraph VII.D.1, whereas the other members of the Affected Class had only the restricted Court Seniority of paragraph VII.D.2; that is, they could be bumped back to their immediate pre-settlement positions before Court Seniority applied. Thus, the court said, the exception clause removed any ambiguity in paragraph D.2, since it meant that the general Court Seniority of paragraph D.1 had at least some applicability, namely to the ten employees who had not transferred prior to the settlement.

This argument is unconvincing. It assumes the very point at issue, i. e., that the "in which" clause modifies "position" rather than "line of progression" and that consequently all but the excepted ten of the fifty-seven Affected Class members could indeed be bumped back to their pre-settlement positions before Court Seniority would apply. Moreover, the argument is even less appealing when paragraphs VII.D.2 and 2 are read together and in the context of the entire agreement.

To recapitulate, paragraph VII.D.1 provides in general language that Court Seniority is to apply in case of layoff, demotion and recall of the 57 Affected Class members. The next paragraph is VII.D.2, the paragraph in dispute here. In the main it deals with the subject of section transfers by Affected Class members. The first clause refers to the ten named Affected Class members who had not yet transferred and reserves to them the right to transfer one time without loss of Court Seniority;[3] the last sentence states that Court Seniority may not be used to jump from section to section.

Sandwiched between these two phrases dealing with transfers is the language at issue. The appellants argue, we think compellingly, that their reading of the language is the natural and appropriate reading, since it also relates to section transfers, i. e., if the "in which" clause refers to "Line of progression," the clause in question merely restricts the use of full Court Seniority to those who refrain from transferring after the date of the settlement. The appellees' reading, on the other hand, would have the disputed clause shift abruptly from the subject of section transfers to an entirely different subject, namely the bumping back to a baseline job of all but ten of the fifty-sev-

---

3. It seems apparent that this provision was intended to permit the laggards to escape from the undesirable lines as their more enterprising brethren already had. That it should intend to put them on a par is understandable; that the clause should be intended to reward their timidity is not.

en Affected Class members. We think it highly unlikely that the parties would have placed so severe a restriction on the use of Court Seniority, by all but a few of the Affected Class members, in the middle of a paragraph that ostensibly deals with intersectional transfers. Nor does the decree as a whole give any hint of a reason why the ten who have not yet transferred should be awarded full Court Seniority in the event of demotions, whereas their brethren would not—particularly when paragraph VII.D.1 appears on its face to give equal rights to all 57 of the Affected Class members. Thus, we think that the appellees' reading of the language is highly artificial.

■ The Supreme Court has cautioned against the use of such "strained" constructions of settlement agreements. *United States v. Atlantic Refining Co.,* 360 U.S. 19, 22, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959); *see also Hughes v. United States,* 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394 (1952). The natural reading of paragraph VII.D.2 is as a restriction on intersectional transfers; thus, the "in which" clause should be read to modify "line of progression" so that all 57 members of the Affected Class are entitled to full Court Seniority in the event of demotion or layoff, subject of course to the transfer restrictions of paragraph D.2 and any further restrictions embodied elsewhere in the settlement.

Because of our reading of the language of the decree, we do not reach appellants' further contentions as to modification of the decree.

We reverse and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

1. 42 U.S.C. § 2000e, *et seq.*

2. On May 10, 1971, thirteen named employees brought a Title VII class action against defendants, company and union, broadly claiming racial discrimination in employment. On December 4, 1972, the parties submitted to the court a proposed settlement agreement subscribed by able counsel. Having analyzed the agreement and found it to be fair, adequate, reasonable

LYNNE, Senior District Judge, dissenting.

This appeal involves only tangentially the familiar right-remedy dichotomy inherent in cases arising under Title VII of the Civil Rights Act of 1964.[1] Primarily, appellants contend for reversal that the district judge misconstrued the terms of a consent decree,[2] entered on the 11th day of January, 1973, in concluding that it had not been violated by defendants. I would affirm.

As of the date of the consent decree, Mr. Freddie Eaton (Eaton) and Mr. Willie Sullivan (Sullivan), both black employees of defendant in its textile manufacturing plant in Mobile, Alabama, each occupied job number 3 (from the bottom) in the Spinning Line of Progression. Thereafter, each advanced to job number 6 therein. Shortly prior to November 26, 1974, in the course of a reduction in force, defendant company, by applying the seniority provisions of its contract[3] with the union[4] as the bargaining representative of its employees rolled back Eaton and Sullivan to the position of Utility Operators (job number 3).

There followed grievances, denied by the company, arbitration, which resulted in vindication of the company's position, and, finally, a motion filed with the court for "declaration of rights and enforcement of the decree," which was denied, engendering this appeal. The focus at each of these stages was on the following provisions of Section VII of the decree:

D. 1. When members of the affected class compete with each other or with employees not of the affected class as to layoff, demotion and recall, Court Seniority shall be the applicable seniority for such purposes and may be utilized by affected class employees and any other employees so competing. Court Seniori-

and not the product of collusion between the parties, the district judge expressly approved it on January 11, 1973. Thus, the settlement agreement became in fact and in law a consent decree.

3. Sometimes referred to as contract seniority.

4. Textile Workers Union of America, AFL–CIO.

ty[5] for the purposes of demotion, layoff and recall shall not be lost by failure either to bid or to accept an entry level job as is set forth in preceding Paragraph "C".

2. Subject to the express exception in Paragraph III.(F) above, an affected class employee or any other person can only use his Court Seniority in the case of demotion, layoff or recall *from his position in the line of progression in which he is as of the date of his Settlement Agreement downward to the entry job in that same line of progression.* He can at no time use Court Seniority to jump from section to section or from department to department. (Emphasis added).

As though it were a simple exercise in syntax, the parties mightily contest the juxtaposition of the prepositional phrase, "in which he is as of the date of this Settlement Agreement," to the nouns, "position" and "line" [of progression].[6]

The arbitrator held that there was no ambiguity present in Paragraph 2 of the decree and that neither Eaton nor Sullivan "had the right to use the expanded court or plant-wide seniority to compete with all others at the time of layoff but rather had to wait until they reached their base job possessed 'as of the date of this Settlement Agreement' before utilizing the Court Seniority."

I do not disagree that ambiguity is present in the naked language quoted above. However, the conscientious district

judge did not mechanically or casually accept the result of the arbitration award. There is implicit in his well-reasoned opinion that he recognized that there is indeed ambiguity when Paragraphs VII(D)(1) and VII(D)(2) are read *in pari materia.* He resolved this patent ambiguity by reference to the concluding language of Paragraph III(F) of the decree[7] and reasoned that the introductory clause of Paragraph VII(D)(2), which refers to Paragraph III(F), removes any ambiguity between the *unrestricted* use of Court Seniority under Paragraph VII(D)(1) and the *restricted* use of Court Seniority under Paragraph VII(D)(2).

I agree that the clearly erroneous rule is not to be applied in reviewing the judgment of the district court. It is the settled rule in this circuit that:

> Since this Court is in as good position to interpret the 190-page written contract as was the district court, we cannot rely upon the clearly erroneous rule, but must ourselves construe the contract without any presumption in favor of the judgment of the district court. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S. C.A.; *Galena Oaks Corporation v. Scofield,* 5 Cir., 1954, 218 F.2d 217.[8] *Illinois Central Railroad Co. v. Gulf, Mobile & Ohio R. Co.,* 308 F.2d 374, 375 (5th Cir. 1962).

The governing rule of construction of a consent decree was stated by the Supreme Court in *United States v. Armour & Co.,* 402 U.S. 673, 681–682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971);

> For its part, appellee would have it read: ". . . an affected class employee . . . can only use his Court Seniority in case of demotion, layoff or recall from [the] position (base job) which he occupied in the line of progression as of the date of this settlement agreement."

---

5. "Court Seniority" is an artificial term, the equivalent of the more common "company" or "plant" seniority (the date of first employment by the company). It denotes seniority superimposed by the decree for stated purposes upon contract seniority.

6. Parsing the sentence structure of Paragraph 2, *supra,* appellants would have it read: ". . . an affected class employee . . . can only use his Court Seniority in case of demotion, layoff or recall from [the] position which he occupied at the time of demotion or layoff." Thus, they contend "the effective date of this agreement" modifies only the line of progression originally selected by him to reach his rightful place.

7. "Any of said named employees accepting the tendered opportunity to advance into said entry level job *shall thereafter have Court Seniority for purposes of promotion, demotion, layoff and recall* in accordance with Paragraphs VII, (C) and (D)(1) hereof respectively." (Emphasis added).

8. *Accord: Gulf, C. & S. F. Ry. Co. v. Coca-Cola Bottling Co. of Cleburne,* 363 F.2d 465 (5th Cir. 1966).

Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. *For these reasons, the scope of a consent decree must be discerned within its four corners and not be reference to what might satisfy the purposes of one of the parties to it.* Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." (Emphasis added; footnote omitted).[9]

After careful review of the consent decree, aided by the briefs and oral arguments of able and experienced counsel, I cannot say that the district judge erred in the construction he placed upon the terms of such decree after critical analysis.

My profound disagreement with the opinion for the Court arises from the rigidity of its mandate that, upon remand, the district judge, stripped of his discretion, must construe ambiguous language precisely as this Court prefers. I could understand a remand which proceeds upon the premise that the consent decree is ambiguous; the ambiguity must be recognized, and it must be resolved forthrightly. How? Appropriately, the Court, relying upon *I. T. T. Continental Baking Co.,* note 9, *infra,* replies: "Where ambiguities exist in the language of a consent decree, the court may turn to other 'aids to construction,' such as other documents to which the consent decree refers, as well as legal materials setting the context for the use of particular terms," yet the Court, without resort to such other aids,[10] proceeds to a construction which is apparently binding upon the district court. I must confess that "[t]he more you explain it, the less I understand it."

I respectfully dissent.

---

9. In our case we squarely face the question as to whether the trial court erred in concluding that defendant had not violated the consent decree.

In *United States v. I. T. T. Continental Baking Co.,* 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975), the Court observed at p. 237, 95 S.Ct. at p. 935:

"We note that this case differs from *Armour, Hughes,* and *Atlantic Refining* in a most important respect. In each of those cases the question of whether or not the consent decree was violated was the question for decision; in this case respondent was found to have committed violations, and the issue before us affects only the manner of assigning penalties for each violation found."

At page 238, 95 S.Ct. at page 935 the Court proceeded:

"Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, *any technical meaning words used may have had to the parties,* and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the 'four corners' rule of *Armour."* (Emphasis added).

10. We are not told what "other aids to construction" may be available, e. g., proposed drafts of a consent decree exchanged by the parties or correspondence which may illuminate their mutual intent.