790 F.2d 1515
 40 Fair Empl.Prac.Cas. 1580,
41 Empl. Prac. Dec. P 36,579, 32 Ed. Law Rep. 482
 Samuel BREWER, Plaintiff-Appellee,
v.
MUSCLE SHOALS BOARD OF EDUCATION, Donald R. Heidorn,
individually and as Superintendent of the Muscle Shoals
Board of Education; Dwight Spearman, James E. Hampton,
Charlene Little, Leon Madden, and J.A. McCarty, individually
and as members of the Muscle Shoals Board of Education; and
Maudine B. Smith, individually and as Principal of Avalon
Middle School, Defendants-Appellants.
 No. 86-7192
Non-Argument Calendar.
 United States Court of Appeals,
Eleventh Circuit.
 May 30, 1986.
 
 Harry L. Hopkins, Lange, Simpson, Robinson & Somerville, James N. Nolan, Birmingham, Ala., Ken Hewlett, Hewlett, Black & Marks, Tuscumbia, Ala., for defendants-appellants.
 Kenneth L. Thomas, Massey, Means & Thomas, Montgomery, Ala., Julia Penny Clark, Washington, D.C., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before FAY, JOHNSON and CLARK, Circuit Judges.
 PER CURIAM:
 
 
 1
 Appellants appeal from the district court's determination that the Muscle Shoals, Alabama, Board of Education and its individual members[1] (collectively, "the Board") breached an Equal Employment Opportunity Commission ("EEOC") predetermination settlement agreement between the Board and Muscle Shoals teacher Samuel Brewer and that the Board and Donald R. Heidorn, Superintendent of the Muscle Shoals School System, violated Title VII of the Civil Rights Act, 42 U.S.C. Sec. 2000e-1 to 17, by rejecting Brewer's application for the position of principal because of his race. They also challenge the district court's exercise of its discretion to remedy these violations by ordering that the Board appoint Brewer principal of some Muscle Shoals school within thirty days[2] and that the Board and Heidorn pay backpay calculated from September, 1981. We affirm.
 
 I. FACTS
 
 2
 Samuel Brewer is black and has been a mathematics teacher in the Muscle Shoals school system for over twelve years. Early in his Muscle Shoals teaching career, Brewer was encouraged by the principal under whom he was employed to pursue his master's degree in school administration. Brewer followed the principal's advice and began taking courses toward his master's degree.
 
 
 3
 In 1976, just prior to finishing his studies and receiving his degree, Brewer applied for the principal position at Webster Elementary School. When a white applicant was selected, Brewer filed a grievance within the school system alleging race discrimination. The grievance was denied, whereupon the Board sent a letter to Brewer stating, "The Board feels that all nine applicants were qualified for said position, including you upon obtaining your Master's Degree but the Board could only employ one person." Defendants' Exhibit 11, p. 3.
 
 
 4
 Brewer completed his master's degree in the summer of 1976 and by early 1977 had received state certification of his qualification to serve as principal or superintendent. In 1977, Brewer applied for two administrative vacancies--principal of Avalon Middle School and career education coordinator. He withdrew his name from consideration for the latter when he learned it was a nontenured position. A black man was chosen to fill the principal vacancy.
 
 
 5
 In 1980, Brewer applied for a new vacancy in the position of principal of Avalon Middle School. He was considered for the position, but a white man was ultimately selected. On this occasion, Brewer filed a charge of racial discrimination with the EEOC. Conciliation efforts resulted in a predetermination settlement agreement[3] between the Board and Brewer in which the Board promised "to favorably consider [Brewer] for the next position for which he is qualified." Record at Tab 33, Exhibit A.
 
 
 6
 Three vacancies in principal positions arose after the agreement was signed and before initiation of this lawsuit. Brewer was considered, but not selected, for all three. The first administrative position to become available after the agreement went into effect was the principal slot at Avalon Middle School for the 1981-82 school year. Early in the selection process, Maudine Smith, a white woman who was Administrative Principal over both Avalon Middle School and Muscle Shoals High School, requested a transfer to the vacant principal's position. Superintendent Heidorn and the Board granted her request and allowed her to continue collecting the administrative principal's higher salary after the transfer. Allegedly for budgetary reasons, Heidorn and the Board decided not to fill the administrative principal vacancy left when Smith transferred. That position is still vacant.
 
 
 7
 During the 1983-84 school year, the principal of Highland Park Elementary School resigned suddenly. Brewer expressed an interest in filling the position, either on a temporary basis until the end of the year or on a permanent basis. Heidorn considered Brewer for the temporary position but decided against selecting him. A white woman was hired.
 
 
 8
 After Heidorn had interviewed two or three people, including Brewer, for the permanent position at the elementary school, Jimmy Howard, the white principal of Muscle Shoals High School, requested a transfer to the elementary school. Heidorn stopped the selection process and recommended Howard for the elementary school position at the higher high school salary level.[4] The Board approved the transfer.
 
 
 9
 Heidorn received twenty-one applications for the principal vacancy that opened up at the high school as a result of Howard's transfer, Brewer's among them. After screening out seven applicants for various reasons Heidorn interviewed the remaining fourteen applicants, including Brewer. Using what he claims was an objective, race-neutral ranking system,[5] Heidorn ranked the candidates and placed Brewer in twelfth place. Heidorn then started at the top of the list and began rejecting the top-ranked candidates for other reasons not factored into the initial ranking decision. He finally settled on the fourth-ranked candidate, Mr. Wilson, who is white. The applicants ranked first, second and third were also white. The Board approved Heidorn's nomination and appointed Wilson to the Muscle Shoals High School principal position.
 
 
 10
 On May 15, 1984, Brewer filed an EEOC charge alleging violation of the settlement agreement and racial discrimination in the selection of Wilson as principal of the high school. On January 25, 1985, Brewer instituted this action. His complaint named the Board (the entity and its members in their individual and official capacities), Heidorn and Smith as defendants and alleged violations of Title VII and 42 U.S.C. Secs. 1981, 1983 and breach of the settlement agreement.
 
 
 11
 In November, 1985, the Board held a meeting at which all members but J.A. McCarty were present. Board member Madden, who is black, testified at trial that during the course of discussing the possibility of creating new assistant administrative positions, Heidorn stated that "if Ms. Hawkins [a black woman] or Mr. Brewer was ever put in one of the positions it would be a downward blow to the school system," and that "[h]e didn't want to see the situation nigger-rigged." Transcript, Vol. I at 58; see also Vol. I at 46. Heidorn admitted using the term "nigger-rigged," explaining that he meant no racial slur but used the term to connote that the school system's administrative organization "was not shaped properly or balanced properly and was out of kilter." Transcript, Vol. I at 82-84.
 
 
 12
 On January 31, 1986, at the close of trial in this case, the district court dictated into the record findings of fact and conclusions of law. The court interpreted the settlement agreement, considered in the context in which it was reached, to require that the Board appoint Brewer to the next administrative vacancy for which he was qualified. The court did not state which of the failures to appoint Brewer to a principalship constituted breaches of the agreement but apparently believed that a breach had occurred, for the court requested the parties to submit suggestions about appropriate relief within twenty days. While recognizing that Heidorn could not be held liable under the contract claim, the court left open the racial discrimination claims under Title VII and 42 U.S.C. Secs. 1981, 1983.
 
 
 13
 On February 24, 1986, when it appeared the parties were unable to negotiate appropriate relief, the district court ordered the Board "to appoint Samuel Brewer as the principal of a school within the Muscle Shoals School System within 30 days from this date." Record at Tab 38. On March 20, 1986, this court stayed that order until June 2, 1986.
 
 
 14
 In a memorandum opinion entered on March 12, 1986, the district court found that the contract breach occurred when Smith was appointed principal of Avalon Middle School beginning in the 1981-82 term because this was the first administrative opening to occur after the settlement agreement went into effect. The court also determined that all defendants except Maudine Smith had intentionally discriminated against Brewer because of his race in violation of Title VII. The court found the defendants' articulated legitimate, non-discriminatory reason for not promoting Brewer--"that he was less qualified than those who were reassigned or appointed to principalships"--to be "transparently pretextual." Record at Tab 42. The court stated that a discussion of liability under Sec. 1983 would be "redundant."
 
 
 15
 Based on these findings, and considering salary information supplied through affidavits from the parties, the court entered judgment against all defendants except Maudine Smith in the amount of $43,000. Damages were calculated from the difference between Brewer's salary as teacher and his likely salary as principal over the years from the 1981-82 term through the 1985-86 term. The Board and Heidorn appeal from the district court's determination of liability under Title VII for race discrimination and breach of the settlement agreement and from the orders regarding injunctive relief and damages.
 
 II. ISSUES
 
 16
 On appeal, the Board raises the following issues pertaining to the breach of contract claim: (1) whether the district court erred in construing the settlement agreement to require that Brewer be appointed to the next available administrative position; (2) whether the district court erred in finding that the Board breached the settlement agreement. The Board and Heidorn raise the following issues pertaining to the Title VII racial discrimination claim and the remedy ordered: (1) whether the district court erred in finding that the Board and Heidorn intentionally discriminated against Brewer; (2) whether the district court abused its discretion in ordering back pay calculated from more than two years before the filing of Brewer's EEOC charge; (3) whether the district court abused its discretion in ordering Brewer's immediate instatement as principal.
 
 III. ANALYSIS
 
 17
 A. Breach of Contract.
 
 
 18
 A predetermination settlement agreement is a contract between a complaining employee and the allegedly discriminatory employer that is reached with the aid of the EEOC prior to an EEOC determination of the merits of the complaining employee's charge of discrimination. See Eatmon v. Bristol Steel & Ironworks, Inc., 769 F.2d 1503, 1511 (11th Cir.1985) (discussion of role of predetermination settlement agreements in Title VII scheme). Construction of such an agreement is governed by principles of federal common law. Id. at 1516-1517. An employee need not file an EEOC charge alleging breach of the agreement to invoke the jurisdiction of a federal court over an action arising from breach of a settlement agreement. Id. at 1510.
 
 
 19
 1. Construction of the Settlement Agreement.
 
 
 20
 The Board first challenges the district court's finding that the agreement "to favorably consider [Brewer] for the next position for which he is qualified" bound the Board to appoint Brewer to the first administrative position to become available after the agreement went into effect. The Board urges us to conduct a de novo review of the district court's interpretation of the contract language.
 
 
 21
 We recognize that contract interpretation is generally a question of law and subject to de novo review on appeal. However, we agree with Brewer that the language at issue is ambiguous. It could mean either "consider in a favorable light," which connotes the uncertainty of result the Board insists is implicit in the language, or "consider with a favorable result," the interpretation the district court found to govern the agreement.[6] The district court was therefore free to consider extrinsic evidence in construing the agreement. See In re Stratford of Texas, Inc., 635 F.2d 365, 368 (5th Cir.1981).[7] We may reverse the district court's findings with respect to the intent of the parties based on the extrinsic evidence only if they are clearly erroneous. Id.; Thornton v. Bean Contracting Co., 592 F.2d 1287, 1290 (5th Cir.1979). These principles apply equally to construction of settlement agreements. See United States v. ITT Continental Baking Co., 420 U.S. 223, 238 & n. 11, 95 S.Ct. 926, 935 & n. 11, 43 L.Ed.2d 148 (1975) (consent decree context); Eaton v. Courtaulds of North America, Inc., 578 F.2d 87, 91 (5th Cir.1978) ("[w]here ambiguities exist in consent decree language, the court may turn to other 'aids to construction' ").
 
 
 22
 The district court found that Brewer used the term "favorably considered" to explain to the Board and the EEOC that he wanted more than mere consideration. Brewer testified as follows about a conversation among an EEOC representative (Mr. Long), Heidorn, the Board's attorney (Mr. Hewlett) and himself:
 
 
 23
 [Mr. Long] told us, first he said, "Mr. Brewer, what do you want?" He said, "We are going to try to settle this thing out of Court." I said, "Well, I am tired of being considered. I want the job." He said, "Well, what do you want?" I said, "[I] need something more stronger than just 'considered'." I said, "I want to be favorably considered for the job. I want the job."
 
 
 24
 And then we were told if a position, an administrative position came open, which I was qualified for, told Mr. Heidorn to give me the job because if he didn't I was certainly going to let them know.
 
 
 25
 Mr. Hewlett asked the question, "Suppose, Mr. Heidorn is not the superintendent?" He [Mr. Long] said, "Well, it is Mr. Heidorn's responsibility to let the next superintendent know, so if the position comes open give the job to Mr. Brewer."
 
 
 26
 Transcript, Vol. II at 347-348. The court found this testimony credible. While Heidorn testified that Mr. Long had assured him, when Brewer was not present, that the Board would not be bound to give Brewer the next position regardless of the qualifications of others who might apply, there was no evidence that any such understanding was discussed in Brewer's presence. Thus it was not clearly erroneous for the district court to conclude that the meaning ascribed to the language by the parties as they engaged in joint discussion of the terms of settlement was that Brewer was to be appointed to the next available administrative position for which he was qualified. Because Heidorn and Hewlett did not object to Brewer's stated understanding of the term "favorably considered," the Board is bound by the meaning discussed in the presence of its representatives. See, e.g., Emor, Inc. v. Cyprus Mines Corp., 467 F.2d 770, 775 (3d Cir.1972) (" 'If one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning.' "); Restatement (Second) of Contracts Sec. 201 (1981).
 
 
 27
 2. Finding of Breach.
 
 
 28
 There is no dispute that the Board passed over Brewer for three principal vacancies after signing the settlement agreement. There is also no dispute that Brewer was qualified (although perhaps not most qualified) to fill the vacancies. Nonetheless, the Board argues it did not breach the agreement, as interpreted by the district court, in failing to appoint Brewer to one of these positions.
 
 
 29
 With respect to the Avalon Middle School principalship to which Maudine Smith was transferred as of the 1981-82 school year, the Board first argues that trial of the question of breach was limited to the two vacancies that opened up for the 1984-85 school year (the Howard transfer and Wilson appointment). It points out that only those two vacancies were specifically listed in the complaint and that Brewer's stated position in the pre-trial order was that the agreement was breached by the failure to appoint Brewer to the two later vacancies. At trial, the Board objected to the introduction of evidence relevant to the Maudine Smith transfer.
 
 
 30
 We hold that the district court did not err when it considered the 1981-82 Smith transfer in finding the Board had breached the agreement. Brewer's complaint alleged generally that the Board "has continuously refused to consider or employ plaintiff in any administrative position." While it specifically listed the two 1984-85 vacancies as examples, the complaint put the Board on notice that all administrative vacancies after the effective date of the agreement were at issue. The Board has not explained or demonstrated how it was prejudiced by the failure of the pretrial order to include the 1981-82 vacancy. As its substantive defense with respect to the failure to appoint Brewer to this vacancy is purely a legal one and requires no evidentiary support, the Board could not have been prejudiced at trial by the introduction of evidence relevant to the Smith transfer.
 
 
 31
 With respect to both the 1981-82 vacancy and the 1984-85 elementary school vacancy, filled by transferring Mr. Howard from the high school, the Board seems to argue that it did not breach the agreement because it filled the vacancy by "transfer" rather than by "appointment." The significance of this argument is difficult to fathom. The question is not how the Board filled the vacancies but whether the vacancies were in positions to which the agreement obligated the Board to appoint Brewer. The Board does not, and could not, argue that they were not administrative positions for which Brewer was qualified. The Board therefore breached the agreement by transferring Smith and Howard in lieu of appointing Brewer.
 
 
 32
 We point out that both transfers were completely within the Board's discretion to deny. The argument that financial considerations forced the Board to eliminate the administrative principal position held by Smith, which consequently forced the Board either to transfer her or to terminate her in violation of her contractual and state rights, is contradicted by the record. The Board granted Smith's request to transfer. It then decided not to fill the vacancy left by her transfer. Had it appointed Brewer to the middle school position as required, Smith could have remained administrative principal.
 
 
 33
 Although we need not decide whether the Wilson appointment also breached the agreement, we note that the Board has advanced no argument in favor of its decision not to select Brewer for the high school position given to Wilson that does not amount to an argument that the district court's construction of the agreement was in error. We have already resolved this dispute in favor of Brewer.
 
 
 34
 B. Intentional Racial Discrimination.
 
 
 35
 The district court found that the defendants' articulated legitimate, nondiscriminatory reason for selecting whites over Brewer to fill the three principal positions was "transparently pretextual." The Board and Heidorn challenge this finding as clearly erroneous. They also argue that the district court erred in holding them liable for the 1981-82 violation, for which no timely EEOC charge was filed.
 
 
 36
 As for the 1981-82 violation, Brewer concedes that his Title VII claim is time-barred, but contends that the district court's reasoning supports liability under the equal protection clause and Sec. 1983. In effect, the district court found the Board and Heidorn liable under Sec. 1983 when it stated that a discussion of that claim would be "redundant." As a finding of intentional race discrimination supports liability under the equal protection clause and Sec. 1983, we will affirm the district court's judgment with respect to the 1981 vacancy, assuming its findings are not clearly erroneous, even though Brewer filed no timely charge with the EEOC. See Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 458-459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975); Alexander v. Gardner-Denver Company, 415 U.S. 36, 47-48, 94 S.Ct. 1011, 1019-1020, 39 L.Ed.2d 147 (1974).
 
 
 37
 We cannot say that the district court's finding of intentional discrimination is clearly erroneous. Brewer presented direct evidence of Heidorn's discriminatory intent through testimony that Heidorn believed appointing Brewer to an administrative position would be a "downward blow" and did not want to see the school system "nigger-rigged." The Board and Heidorn therefore had the burden of proving that they would not have selected Brewer even without the discriminatory animus. Lee v. Russell County Board of Education, 684 F.2d 769 (11th Cir.1982). That the direct evidence was based on an incident occurring after the alleged violations makes no difference. It would be entirely reasonable to assume that Heidorn's attitude was not newly developed at the time he made the derogatory comments and that the discriminatory animus causing his reluctance to appoint Brewer to an administrative position at that time had similarly affected his decisions on previous occasions. In fact, the Board and Heidorn had once before been held liable for racial discrimination for failing to reinstate a black principal who had lost his position as a result of court-ordered desegregation. See Lee v. Macon County Board of Education, 453 F.2d 1104, 1112 (5th Cir.1971).
 
 
 38
 In this case, the determination whether the defendants' asserted legitimate reason was pretextual and whether the Board and Heidorn would have made the same decisions absent discrimination was purely a matter of assessing credibility. As such, the district court's findings are entitled to particular deference. As our review of the record does not leave us with the definite and firm conviction that a mistake has been made, we affirm the district court's finding that Heidorn and the Board intentionally discriminated against Brewer because of his race in violation of the equal protection clause and 42 U.S.C. Sec. 1983.
 
 
 39
 C. Remedies.
 
 
 40
 1. Backpay.
 
 
 41
 Heidorn and the Board point out that a backpay award under Title VII may not reach back more than two years prior to the filing of the EEOC charge. They correctly state the law. See 42 U.S.C. Sec. 2000e-5(g). Nonetheless we may allow the award to stand, for the Board's liability is based in part on the contract violation and Heidorn's liability is premised on 42 U.S.C. Sec. 1983. We therefore hold that the district court did not abuse its discretion in ordering backpay as of the 1981 violation.
 
 
 42
 2. Reinstatement.
 
 
 43
 The Board argues that the district court's order that it appoint Brewer principal of some school in the Muscle Shoals school district within thirty days will require it to discharge or transfer ("bump") the employee currently holding the position in contravention of Title VII case law. Now that the injunctive relief has been stayed to the end of the 1985-86 school year, it is possible that there exists a principalship vacancy to which the Board can appoint Brewer without bumping any other employee. Assuming that no vacancy exists for next year, we nonetheless hold that the district court did not abuse its discretion by ordering this type of relief.
 
 
 44
 The Board has cited decisions from the Title VII context stating that a court may not require an employer to displace one employee by promoting another as a remedy for past discrimination in the employer's seniority system. See, e.g., Gamble v. Birmingham Southern R.R., 514 F.2d 678, 683 (5th Cir.1975). While our jurisdiction over an action arising from the alleged breach of a predetermination settlement agreement is based on Title VII, Eatmon, supra, the appropriateness of ordering relief that may require bumping in the context of breach of a settlement agreement is not settled by the cases on which the Board relies.
 
 
 45
 Courts have ordered instatement (or reinstatement) although bumping would be necessary to comply with the order on several occasions. In Lee v. Macon County Board of Education, 453 F.2d 1104 (5th Cir.1971), the former Fifth Circuit ordered that a black man who had not been reinstated to the first available principal vacancy after the loss of his position due to desegregation, as required under Fifth Circuit case law, be appointed to the position he should have been given (or to a comparable position) despite the fact that the school board had already filled the vacancy and no other positions were available. The court stated that it could not be prevented from ordering relief in vindication of the law and the Constitution by the fact that the Board had already filled the vacancy in violation of established law. Id. at 1112.
 
 
 46
 The court in Spagnuolo v. Whirlpool Corp., 717 F.2d 114 (4th Cir.1983), explained how this type of remedy may be reconciled with the "rightful place" theory that underlies the seniority system cases cited by the Board. In Spagnuolo, the employer had already been found to have discharged the employee illegally (because of his age) and had been ordered to reinstate the employee to the first available comparable position.[8] This order did not require bumping and was therefore consistent with the theory that aggrieved employees should not be allowed to displace incumbent employees but may only be given the right to fill future job vacancies (the "rightful place" theory). After sixteen months had passed and it appeared that the employer was not going to comply with the ordered remedy, the district court amended its order to require that the employer remove the incumbent employee and reinstate Spagnuolo to the position from which he was wrongfully discharged.
 
 
 47
 On appeal, the court of appeals explained that the rightful place theory had developed out of recognition that Congress had compromised in enacting Title VII by giving assurances that those persons who had benefitted from past discrimination would not be displaced by enforcement of the proposed law. Id. at 120. The theory also grew out of concern that blacks not be displaced and that court-ordered remedies not unduly disrupt business operations. Id. Having reasserted the currency and legitimacy of this theory, the court nonetheless held that the district court was empowered to order removal of an incumbent employee from a position that became available after the original order so that Spagnuolo could be instated in the position he should have been given. Id. at 122. The court reasoned that the employee who is promoted or hired after the judicial pronouncement of discrimination is not innocent. It concluded that such equitable action was within the district court's power to enforce its orders and was authorized under Title VII.
 
 
 48
 The district court in this case was faced with a similar dilemma. It was not asked to remedy discrimination in the first instance but was called upon to fashion an appropriate response to an employer who has demonstrated repeated unwillingness to comply with the agreed resolution of a discrimination claim. While a settlement agreement is not premised on any finding--administrative or judicial--of intentional discrimination, it nonetheless provides the only relief the aggrieved employee will obtain, for it stands in the place of any further pursuit of administrative or judicial remedies. We have often noted that "Congress intended Title VII to be enforced primarily through conciliation and voluntary compliance." Eatmon, 769 F.2d at 1509. It would be antithetical to Congress' strong commitment to conciliation to permit the recalcitrant employer forever to circumvent the provisions of a settlement agreement by filling every disputed vacancy. We agree with the Fourth Circuit that the courts must have the power to enforce Title VII remedies in this way.
 
 
 49
 We note that the relief ordered in this case will not require the Board to discharge or in any way interfere with the contractual rights of an incumbent employee. If no principalship has opened up for the 1986-87 year, the Board can return Maudine Smith to the administrative position she held before her transfer to Avalon Middle School. Brewer can then be appointed to the middle school position. The parties will be placed exactly where they should have been had the Board not breached the agreement in the first place.[9]
 
 
 50
 The remedy ordered in this case was within the court's power to enforce agreements in resolution of Title VII disputes and results in no unfairness to "innocent" third parties. We hold that the district court did not abuse its discretion. Having determined that the district court's findings with respect to liability are not clearly erroneous and that it acted within the bounds of its discretion in ordering relief for the contract and Sec. 1983 violations, we affirm the decision of the district court.
 
 
 51
 AFFIRMED.
 
 FAY, Circuit Judge, concurring statement:
 
 52
 While concurring in the opinion of the court, I add one small note of explanation. Personally, I find nothing ambiguous about the words "favorably consider." The Board and Brewer entered into a valid and binding contract. Brewer was to be appointed to the next position for which he was qualified. The contract was breached. The relief afforded is both legal and proper. In all other regards, I concur fully.
 
 
 
 [1]
 Dwight Spearman, James E. Hampton, Charlene Little, Leon Madden and J.A. McCarty
 
 
 [2]
 On March 20, 1986, this court entered an order staying until June 2, 1986, the district court's order regarding Brewer's instatement as principal
 
 
 [3]
 See infra at 9 for explanation of "predetermination settlement agreement."
 
 
 [4]
 According to Brewer, the only instances in which an administrator in the Muscle Shoals school system has been allowed to transfer voluntarily to a lower paying position without taking a pay cut were when Maudine Smith and Jimmy Howard transferred into the positions for which he was being considered
 
 
 [5]
 Heidorn rated the candidates according to four criteria: (1) years of administrative experience, (2) years of administrative experience in the Muscle Shoals system, (3) years of total (teaching and administrative) experience, and (4) highest degree or certificate earned
 
 
 [6]
 Webster's Unabridged Third New International Dictionary (1976) contains the following definitions of "favorable," among others: "giving a result that is in one's favor ... granting or obliging in what is desired ... marked by success ... turning out in the way desired or hoped."
 
 
 [7]
 In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981
 
 
 [8]
 Spagnuolo v. Whirlpool Corp., 641 F.2d 1109 (4th Cir.), cert. denied, 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981)
 
 
 [9]
 In Banks v. Burkich, 788 F.2d 1161 (6th Cir.1986), the court held that the district court abused its discretion in refusing to order reinstatement that would require displacing an incumbent employee where the employer had withheld its recommendation of promotion in retaliation for the plaintiff-employee's political activities in violation of the First Amendment. The court first held that courts have the power to order (re)instatement. It noted the importance of (re)instatement, as opposed to money damages, in remedying First Amendment violations and preventing the chilling effect of threat of termination. Implicit in its discussion is the concern that employers not be allowed to circumvent the First Amendment by effectively substituting money damages for (re)instatement. Finally, the court pointed out that the incumbent employee could be transferred without suffering any infringement of contractual or constitutional rights. The Sixth Circuit's analysis thus parallels our own and that of the Fourth Circuit in Spagnuolo