CITY OF AUSTIN, TEXAS and Lower Colorado River Authority, Plaintiffs-Appellees,

v.

DECKER COAL COMPANY, a Joint Venture, Wytana, Inc. and Western Minerals, Inc., Defendants-Appellants.

No. 81–1618.

United States Court of Appeals, Fifth Circuit.

March 28, 1983.

Rehearing and Rehearing En Banc Denied May 31, 1983.

Britton White, Jr., Paul D. Phillips, Denver, Colo., Brown, Maroney, Rose, Baker & Barber, Scott R. Kidd, Austin, Tex., for defendants-appellants.

Terrence Irion, Asst. City Atty., Austin, Tex., for plaintiffs-appellees.

Small, Craig & Werkenthin, James M. Alsup, C.C. Small, Jr., Austin, Tex., for Lower Colo. River Authority.

Before RUBIN, RANDALL and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

## I. INTRODUCTION

This case comes before this court from a decision by the district court for the Western District of Texas, Bunton, J., in favor of the plaintiffs—the City of Austin, Texas, and the Lower Colorado River Authority.[1]

We are presented with a question of allocation of costs under a coal procurement contract entered into between the plaintiffs and Decker Coal Company.[2] Specifically, the issue involved is whether, pursuant to the contractual provision allowing Decker to pass costs on to the plaintiffs for "any new legislation, regulation, judicial action ... or labor agreement ... enacted, promulgated, or taken or made effective after March 31, 1974," Decker could pass through cost increases resulting from a 1976 determination by the Montana Department of State Lands [hereinafter, "MDSL"], pursuant to a pre-1974 Montana statute, which precluded "disturbance" of a certain portion of land within the proposed mine area.[3]

Because we find, based on an interpretation of the entire contract as required by Montana law,[4] that the parties intended to allow pass-through of costs resulting from governmental action such as was involved here, we reverse the decision of the court below and remand for a determination of increased mining costs chargeable to the plaintiffs.

## II. MOTION FOR CERTIFICATION

We note at the outset that Decker has filed a Motion for Certification to the Montana Supreme Court of the single issue involved herein. We hereby deny that motion.

Our decision not to certify the issue is based on the logic set forth in *Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 274–76 (5th Cir.1976), and on the traditional use of certification. If this case turned on Montana's definition of "regulation" or other terms about which the Montana court possessed expertise, this would be a different case. As we discuss below, however, we base this decision on a determination of intent as manifested by the contract. Because we are as capable of making that determination on the basis of the record as is Montana, we will do so.[5]

---

1. Lower Colorado River Authority is a conservation and reclamation district created by Texas law. Its principal offices are located in Travis County, Texas.

2. Decker Coal Company is a joint venture comprising Wytana, Inc., a Delaware corporation with principal offices in Nebraska, and Western Minerals, Inc., an Oregon corporation. Its principal offices are located in Sheridan, Wyoming. The coal mine is located in south-central Montana, near the Montana-Wyoming state-line.

3. This case was bifurcated by the district court for liability and damage determinations. Because the court found that the contract did not allow pass-through of the costs in question, a determination of damages was not necessary.

The parties stipulated that Decker's costs of mining were increased as a result of MDSL's permit restriction.

4. Mont.Code Ann. § 28-3-202 (1979). Jurisdiction in district court was based on diversity under 28 U.S.C. § 1332. Under Texas's choice-of-law rules, the contractual choice-of-law applies. *See Austin Bldg. Co. v. National Union Fire Ins. Co.*, 432 S.W.2d 697, 701 (Tex.1968). Article 16.01 of the contract provides that Montana law governs its construction.

5. We note that in *Shevin* the court specifically stated, that "considerations [in favor of certification] are more applicable in this case [involving suit brought by the Florida attorney general under state statute] than in one involving, for

## III.  FACTS

### A.  The Contract

In an effort to meet growing energy demands, the plaintiffs, City of Austin and Lower Colorado River Authority, formed jointly the Fayette Power Project. Included in the project's plans were an electric generation station with one 600-megawatt unit and other units with a variety of coal-burning capabilities.

On October 24, 1974, the plaintiffs entered into the Coal Purchase Contract with Decker. Under the contract, coal deliveries were scheduled to begin in 1978 and to continue for approximately 26 years, until 2003. Over the course of the contract over 50 million tons of coal are to be delivered.[6]

The contract established a "base price" of $7.00 per ton as of March 31, 1974. Numerous price adjustment mechanisms were built into the contract, primarily in article IX, which is a detailed enumeration of adjustment factors, covering 11 pages. The pertinent clause within article IX of the contract is paragraph 9.06:

> ADDITIONAL COSTS IMPOSED BY LEGISLATION, REGULATION, JUDICIAL ACTION, LABOR AGREEMENT, OR CHANGES IN THE METHOD OF OPERATION DUE TO MATERIAL SHORTAGES
>
> The price of coal shall be increased from the base price in the same amount that the cost per ton of mining coal at the Mine is increased by any direct cost or required investment in order to comply with any new legislation, regulation, judicial action (other than the codification of the common law), or labor agreement which provides for new "add-ons" or additional personnel . . . . enacted, promulgated, or taken or made effective after March 31, 1974.

example, the interpretation of a clause in an insurance contract."  526 F.2d at 275.

**6.**  Despite this contract dispute, the parties continue to operate under the agreement, and coal shipments are continuing.

### B.  The Mine

In July 1973 Decker filed an Application for Prospecting Permit with MDSL for exploration by rotary drill holes in Big Horn County, Montana. The site, known as "East Decker," is east of the Tongue River Reservoir directly across from another Decker mining area, dubbed "West Decker." Decker had acquired a perpetual coal lease for this area in September 1971.

The East Decker site lies, in part, within the Deer Creek floodplain, through which Deer Creek flows on its way to Tongue River Reservoir. Deer Creek has a drainage area of approximately 50 square miles and its floodplain contains riparian timber, shrub habitat and significant wildlife.

Decker's permit application specified the acreage to be disturbed, the method of prospecting, the mineral sought, and included a Detailed Prospecting Reclamation Plan with maps. In its reclamation plan, Decker stated: "2. The Company assures the Department of State Lands that the area covered by the application for prospecting permit includes no land having special, exceptional, critical, or unique characteristics as defined in Section 9(2) (a, b, c, d) Chapter 325, Laws of Montana 1973." [7]

Decker went on to say that based on interviews with local residents of the community, no "archaeological, historical, ethnological and cultural values" would, to Decker's knowledge, be affected. Nor would the "use, enjoyment, or fundamental character" of neighboring lands with such characteristics be adversely affected. Decker promised MDSL that should any characteristics of "Section 9" lands be encountered it would cease prospecting, notify MDSL immediately, and reclaim all disturbances within the area having those characteristics.[8] The Application for Prospecting

**7.**  Exhibits 2–1 and 2–2 to Docket Entry 38. The lands possessing such characteristics are referred to hereinafter as "Section 9" lands.

**8.**  *Id.*

Permit and appended Detailed Prospecting Reclamation Plan were filed as required by the Montana Strip and Underground Mine Reclamation Act, 1975 Mont.Laws ch. 441, sec. 14, and by the regulations adopted by MDSL pursuant thereto, Mont.Admin.Code §§ 26–2.10(10)–S10270 to –350 (1973).[9]

On July 23, 1973, MDSL issued Decker a permit allowing Decker to prospect on the lands in question, according to the procedures and assurances which it had set forth in its permit application. This permit was reissued on September 21, 1973, and renewed on September 20, 1974. In the 1974 renewal MDSL stated that the permit "in no way implies future Department approval of any area for mining," and attached a MDSL letter spelling out the requirements vis-a-vis the nearby Tongue River Reservoir so that no water pollution should occur.[10]

Finally, on April 9, 1975, Decker submitted an application for a strip mining permit to MDSL. Included in the application was a proposal to place "overburden" and spoil materials into the Deer Creek floodplain, to divert Deer Creek from its original channel, and to affect Deer Creek drainage in other ways. Decker submitted archaeological, ecological and topographic data with the application and stated that the area did not encompass any "Section 9" lands. Appended to the application was a 1973 "Historic and Archaeologic Resources Impact Appraisal" which included an evaluation of the proposed mining area. According to Decker, this report, prepared by Western Interpretive Services, indicated "a low probability of the area" possessing special characteristics as set forth in Section 9.[11]

### C. The Problem

Pursuant to its statutory[12] and regulatory requirements,[13] MDSL had begun its process of determining whether Decker's proposed mining plan would adversely affect any lands that had the characteristics required for "Section 9" classification. This analysis began at least as early as February 1, 1974. Over the next 2 years, MDSL conducted extensive investigations to make

**9.** The act was amended in 1979 and is now found at Mont.Code Ann. §§ 82–4–201 et seq. (1979). Section 9 of the 1973 act, 1975 Mont. Laws ch. 441, sec. 21, provided:

(2) The department shall not approve the application for a prospecting, strip mining or underground mining permit where the area of land described in the application includes land having special, exceptional, critical, or unique characteristics, or that [sic] mining or prospecting on that area would adversely affect the use, enjoyment, or fundamental character of neighboring land having special, exceptional, critical, or unique characteristics. For the purposes of this act, land is defined as having such characteristics if it possesses special, exceptional, critical or unique:

(a) biological productivity, the loss of which would jeopardize certain species of wildlife or domestic stock; or

(b) ecological fragility, in the sense that the land, once adversely affected, could not return to its former ecological role in the reasonable [sic] foreseeable future; or

(c) ecological importance, in the sense that the particular land has such a strong influence on the total ecosystem of which it is a part that even temporary effects felt by it could precipitate a system-wide reaction of unpredictable scope or dimensions; or

(d) scenic, historic, archaeologic, topographic, geologic, ethnologic, scientific, cultural, or recreational significance. In apply-

ing this subsection, particular attention should be paid to the inadequate preservation previously accorded Plains Indian history and culture.

Throughout the reclamation plan, Decker made repeated references to ecological and environmental concerns.

**10.** Exhibits 8–1 and 8–2 to Docket Entry 38.

**11.** Exhibit 9–1 to *Id.* The Western Interpretive Services report was not included with the record before either this court or the district court.

**12.** 1975 Mont.Laws ch. 441, sec. 21 provided:

An application for a prospecting, strip mining or underground mining permit shall not be approved by the department if there is found on the basis of the information set forth in the application, an on-site inspection, and an evaluation of the operation by the department that the requirements of the act or rules will not be observed or that the proposed method of operation, backfilling, grading, subsidence stabilization, water control, highwall reduction, topsoiling, revegetation, or reclamation of the affected area cannot be carried out consistent with the purposes of this act.

**13.** Mont.Admin.Code § 26–2.10(10)–S10270 (1973).

this determination. As set forth in Decker's response to plaintiffs' interrogatories, at least 15 meetings were held with MDSL officials to discuss the problems MDSL perceived insofar as whether the lands affected had the characteristics described in Section 9.

In February 1976, MDSL determined that portions of the mining area did possess "Section 9" characteristics.[14] Subsequently, in March 1976, MDSL established a tentative "non-disturbance" line which essentially provided that the Upper Deer Creek floodplain could not be disturbed, but which allowed disturbance of the Lower Deer Creek floodplain. This line was established finally in April 1977 and was presumably based on a decision that the Upper Deer Creek floodplain was "Section 9" land and that the Lower Deer Creek floodplain was not.

As a result of this determination, Decker had to revise its proposed mining plan to avoid disturbance of the protected area. After nine additional meetings to consider the "Section 9" problem, and after submission of three proposed mining plans by Decker, MDSL approved a plan on July 13, 1977, which replaced the use of draglines with a truck-and-shovel mining method. This plan, as determined by MDSL, eliminated the deposit of "overburden" or other disturbance in the Upper Deer Creek floodplain.

Unfortunately, as stipulated by the parties, the substitute method increased the costs of mining.[15]

All of which brings us back to the only issue which concerns us: Was the action taken by MDSL in February–March 1976 in classifying the Upper Deer Creek floodplain

as "Section 9" land and in establishing the non-disturbance line a "new . . . regulation . . . enacted, promulgated or taken or made effective after March 31, 1974," as contemplated by the contract?

## IV. DETERMINATION

### A. Standard of Review

In the Findings of Fact and Conclusions of Law entered pursuant to its judgment, the district court held that the contract is "unambiguous on its face" and that the term "new . . . regulation . . . does not apply to mere enforcement of regulations already existing." The court found for the plaintiffs and awarded them some $10.1-million, which had been the stipulated amount of damages should the plaintiffs prevail on the liability portion of the case.[16]

Our initial question in reviewing this dispute concerns the correct standard of review.

This circuit, in conformity with other circuits, has consistently held that the interpretation of a contract "is a matter of law reviewable *de novo* on appeal." *Matador Drilling Co., Inc., v. Post,* 662 F.2d 1190, 1197 (5th Cir.1981). *See also Eaton v. Courtaulds of North America, Inc.,* 578 F.2d 87, 90 (5th Cir.1978). The stated and logical reason for *de novo* review is that "this Court is in as good position to interpret the . . . written contract as was the district court." *Illinois Central R.R. v. Gulf, Mobile & Ohio R.R.,* 308 F.2d 374, 375 (5th Cir. 1962).

■ This broad standard of review includes the determination of whether the contract is ambiguous. This initial determination is, equally with other aspects of con-

---

14. Specifically, MDSL found that the Deer Creek floodplain contained "special values in terms of biological productivity and as [sic] critical in terms of ecological fragility and importance" and would be adversely affected by the proposed mine. Further, MDSL determined that Tongue River Reservoir, which possessed special characteristics, would also be adversely affected. Letter from C.C. McCall, Administrator, MDSL Reclamation Division, to Jack Reed, Decker Coal Company (Feb. 17, 1976).

15. The tentative estimate of the parties is that the increase amounted to approximately $1-per ton, or $50-million over the life of the contract. Whether this is accurate or not remains to be seen, as do other considerations in the determination of damages.

16. The $10.1-million represents the payment by the plaintiffs for incremental costs resulting from Decker's change in the method of mining, plus prejudgment interest.

tract interpretation, a question of law. *In re Stratford of Texas, Inc.,* 635 F.2d 365, 368 (5th Cir.1981).

We must keep in mind that " '[c]ontracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction'," *Freeman v. Continental Gin Co.,* 381 F.2d 459, 465 (5th Cir.1967), *quoting Whiting Stoker Co. v. Chicago Stoker Co.,* 171 F.2d 248, 250–51 (7th Cir.1948).[17]

■ With this caveat in mind, and mindful of the prescriptions of Montana law which govern contract interpretation; we find the contract unambiguous, as did the lower court, but find that the contract evidences an intent that a determination of the type made by MDSL in February-March 1976 comprised a "new . . . regulation" within the meaning of the contract.[18]

### B. Contract Interpretation Under Montana Law

■ Turning to Montana law, we note initially that courts are to give effect to the mutual intent of the parties which existed at the time of contracting, "so far as the same is ascertainable and lawful."[19] That intent "is to be ascertained *from the writing alone* if possible."[20] The entire contract is to be looked to in determining intent[21] and "[t]he words of a contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning unless used by the parties in a technical sense . . . ."[22]

■ Our task is to look to the entire contract and "to give effect to every part if reasonably practicable, each clause helping to interpret the other."[23] We are bound by the contract and may not reconstruct it by outside reference.

### C. The Contract

The City of Austin argues that the action taken by MDSL did not constitute "new . . . regulation" within the meaning of the contract for two reasons. First, the action was not "new" because the statute prohibiting mining operations on Section 9 lands was in effect prior to "the critical date," *i.e.,* March 31, 1974, "and this statute constituted the regulation. . . ." Second, the City of Austin argues that MDSL's action was merely administrative enforcement of an existing regulation and was not itself a "regulation" within the meaning of the paragraph 9.06.

Decker argues that the action taken in February-March 1976 establishing Upper Deer Creek floodplain as "Section 9" land and precluding mining activity on that land was both "new," *i.e.,* occurring after March 31, 1974, and a form of "regulation" within the meaning of paragraph 9.06.

In order to determine the intent of the parties in the creation of paragraph 9.06, an analysis of the relevant sections of the contract is required.

The prefatory language provides that the purpose of the contract is to provide "an assured and dependable supply of low sulphur coal. . . ."

Article I states simply that Decker owns leases from which the coal shall be mined.

---

**17.** By the same token, the fact that courts may disagree as to the import of a contract term does not, by that fact alone, mean that it is ambiguous.

**18.** The determination of the parties' intentions, as revealed solely by the contract, is but another form of contract interpretation, and therefore constitutes a question of law. Only when the contract is ambiguous does determination of the parties' intent involve a question of fact. *Fujimoto v. Rio Grande Pickle Co.,* 414 F.2d 648, 654 (5th Cir.1969). Having found the contract neither patently nor latently ambiguous, it

is therefore appropriate for us to interpret the contract in its entirety to determine intent.

**19.** Mont.Code Ann. § 28–3–301 (1979).

**20.** *Id.* § 28–3–303 (1979) (emphasis added).

**21.** *Id.* § 28–3–202. *See Rumph v. Dale Edwards, Inc.,* 183 Mont. 359, 600 P.2d 163, 168 (Mont.1979).

**22.** *Id.* § 28–3–501.

**23.** *Id.* § 28–3–202.

At the time of execution of the contract, Decker "is planning to open the Mine."

Article II provides a twenty-six year contract term with delivery to commence sometime between January 1 and September 30, 1978.

Article III provides that, during the term of the contract, between 51.6—56.76 million tons of coal are to be delivered.

Article IV specifies the quality of the coal, with an approximate average per pound "heat content" of 9,200 BTU. A reduction of 50¢ per ton from the "then-current price" is provided for usable coal with less than 9,000 BTU per pound.[24]

Article V provides that Decker will install "the most modern machinery, equipment and other facilities," that it will operate the machinery in order to produce the coal efficiently and economically, and that the machinery, equipment and facilities will be acquired by Decker "with its own capital."

Article VIII provides a "base price" of $7.00 per ton, subject to adjustments provided in articles IV and IX.

Article IX contains the major price adjustments and is discussed below.

Article XI is the force majeure clause.

Article XV provides that the City of Austin can discontinue acceptance of delivered coal when its sulphur content exceeds or its BTU content falls below article IV requirements for any two consecutive months.

The remaining portions of the contract cover such matters as billing, severability, accountants' reports, waivers and notices, and nondiscrimination in employment.

Article IX comprises the principal price adjustment clause in the contract. It covers eleven pages and provides eleven categories of price changes. The article IX paragraph, adjustment factor, base figure, base date, adjustment basis and party benefited are as follows:

| Contract Paragraph | Adjustment Factor | Base Figure | As Of | Adjustment Based On | Party Benefited |
|---|---|---|---|---|---|
| 9.01 | Materials and Supplies | $1.06 | 3–31–74 | BLS Statistics (composite of monthly Wholesale Price Index for Construction Machinery and Equipment and for Metals and Metal Products) | Both |
| 9.02 | Labor, Salaries and Related Costs | 1.35 | 3–31–74 | Weighted Average Hourly Rate for Labor Based on Labor Classification Schedule | Both |
| 9.03 | Costs Based on Values such as ad valorem, production, severance, and real estate taxes | .23 | 3–31–74 | Actual Costs (when coal is mined) | Both |
| 9.04(1) | Costs Based on Extraction (such as royalty, pension plan payments) | .635 | 3–31–74 | Actual Costs | Both |
| 9.04(2) | Other Costs for the Right to Mine (payments by seller for surface damage | No Base | 3–31–74 | Actual Costs | Decker |
| 9.05 | Other New, Increased Taxes | No Base | 3–31–74 | Actual Costs | Both |

**24.** Adjustments are provided to compensate for deviations from the 9,200 BTU level in paragraph 9.09.

| Contract Paragraph | Adjustment Factor | Base Figure | As Of | Adjustment Based On | Party Benefited |
|---|---|---|---|---|---|
| 9.06 | Additional Costs Imposed by Legislation, Regulation, Judicial Action, Labor Agreement or Changes in Method of Operation due to Material Shortages | No Base | 3–31–74 | "Any direct cost of required investment in order to comply with any new legislation, regulation, judicial action (other than codification of the common law) or labor agreement … enacted, promulgated, or taken, or made effective after March 3, 1974." | Decker |
| 9.07 | Transfer Taxes (such as sales and use taxes) | No Base Specified | None | Actual Cost | Decker |
| 9.08 | Composite Adjustment in the various items making up the total base price which are not otherwise provided for in §§ 9.01, 9.02, 9.03 and 9.04(1) | 50% of 3.575 (1.7875) | 3–31–74 | Multiply by % increase or decrease in weighted average hourly wage rate (par. 9.02) | Both |
| | | 50% of 3.575 (1.7875) | 3–31–74 | % increase of decrease in BLS Wholesale Price Index for Construction Machinery and Equipment (par. 9.01) | Both |
| | | .15 | 3–31–74 | % increase or decrease in consumer price index | Both |
| 9.09 | Quality Adjustment | No Base Specified | None | % variation from prescribed specifications | Both |
| 9.10 | Price Controls | No Base Specified | None | Reduce Price if Unlawful | Austin |

The contract provides that article IX adjustments be made quarterly. Thus, in the first quarter of actual mining, adjustments for 1974–1978 would be made. This price would in turn be revised each quarter.[25]

In analyzing the effect of these various elements of the contract, we turn first to the question presented by a reading of article V, providing that "Seller agrees that the machinery, equipment and facilities provided by it shall be acquired with its own capital." It is urged that this required Decker to absorb all start-up costs and prohibited its passing on to the City of Austin cost increases resulting from interim government-mandated mining changes.

There are critical flaws in such an analysis. First, the most obvious difficulty is that, if the parties did not intend interim government-mandated cost increases to be added to the price of coal, March 31, 1974, would not have been designated as the base date in paragraph 9.06; rather the start-up date would have been used. Second, although the exact nature of the government-mandated increases with which we are dealing remains to be elucidated, some of those increases undoubtedly bear on the various elements which comprise the $7.00 base price, viz.: materials, supplies, labor and so forth. Clearly under the contract interim increases in those costs are to be added to the price of coal. There is no evident rea-

25. It should be noted that the sum of the "base figures" is $7.00, the "base price."

son why other interim cost increases, although mandated by the government, should be treated any differently.[26] Third, the critical word in article V is "acquire." This implies that Decker was to obtain and make the initial payments for machinery, equipment and facilities. To "acquire" means "to gain possession of;" it does not imply that Decker was to bear the ultimate cost.

We grant that the costs which might result from MDSL's actions could affect the "start-up" costs. That paragraph 9.06 intended to cover such costs, however, is evidenced by its broad language, *i.e.*, "The price of coal shall be increased from the base price in the same amount that the cost per ton of mining coal at the Mine is increased by *any direct cost or required investment....*" The contract goes on to discuss the computation method for a "capital investment" required under paragraph 9.06. There is no distinction made between pre- and post-start-up costs or investments.

In our view, article V constitutes essentially boilerplate language which, when read in conjunction with article VIII and article IX, requires simply what it states—Decker was to use its own capital in purchasing equipment and facilities in the start-up of the mine. These capitalization costs were factored into the base price, and interim changes in these costs provided in paragraph 9.06 required per ton price adjustment just as did *any other cost changes.*

The $7.00 "base price" was primarily that—a basis. It was never intended to be the actual price for the coal.[27] As indicated by the fact that it was dated some four years before actual delivery, this base price

is more important in its function as a gauge for future adjustments than as a price.

It is true that no base figure and no defined schedule is provided for applying cost increases under paragraph 9.06. This does not render it an abstraction, however. "Any direct cost or required investment" was to be factored into the price of the coal. Of course the price could not be adjusted until mining and delivery of coal began— until then there would be no "price"—but it was to be based on events which occurred after March 31, 1974.[28]

■ In short, adjustment is provided for all other interim cost increases; interim increases required by governmental action are not treated any differently under the terms of the contract itself. If we are to give effect to every part of the contract,[29] we must conclude that qualified, interim government-mandated cost increases were to be treated like all other cost increases and added to the price of the coal.

This brings us to the next step in our analysis: Whether the actions by MDSL were "new ... regulations" within the meaning of paragraph 9.06.

We start with the premise that under Montana's guidelines for contract interpretation we are to view the words "new regulation" in "their ordinary and popular sense rather than according to their strict legal meaning unless used by the parties in a technical sense...."[30]

The City of Austin argues in this regard that the word "regulation" was indeed used in a "technical sense" in that the four types of activity listed in paragraph 9.06—"legis-

---

**26.** For example, had Montana adopted a new tax during the interim period which was covered by paragraph 9.05, this would be adjusted for in the price of the coal.

**27.** The parties knew that when delivery actually began the price would likely be much higher. Thus, in paragraph 9.09, an illustrative price of $16.00 per ton is used in discussing quality adjustment. Throughout the contract terms such as "then current price" (article IV) or "current sales price" (article XI) are used. The breakdown of the base price into its various components, each with its own price factor,

indicates the significance of the $7.00 "base price" as a base rather than as a price.

**28.** As in the case of paragraph 9.07, paragraph 9.06 is speculative in nature and merely seeks to clarify a possible eventuality. An accurate "schedule" for such an unknowable, future occurrence contradicts the very uncertainty with which the parties were concerned.

**29.** Mont.Code Ann. § 28–3–202 (1979).

**30.** *Id.* § 28–3–501.

lation, regulation, judicial action (other than codification of the common law), or labor agreement"—were deliberately matched with the four verbs which follow—"enacted, promulgated, or taken or made effective." The City of Austin argues that read thus it is patent that only "regulations . . . promulgated" after March 31, 1974, qualify as "new regulations."

We are not persuaded that there is such a careful pairing of noun and verb as to allow a technical reading of this contract clause. Legislation can be "enacted" or "promulgated" on one date and "made effective" on another date. The same is true for regulations. A labor agreement can be "promulgated" on one date and "made effective" on another date. So, in rare instances, a judicial decision may be "taken" and "made effective" on different dates.[31]

Read in consonance with the entirety of article IX, which provides that all components in the price will be adjusted to reflect costs, we read this contract language as an informal recitation covering the "three branches" of government. We interpret this language as the parties essentially saying, "Here are the elements which make up the cost of mining coal. If, subsequent to March 31, 1974, the government takes new judicial, legislative or administrative actions which increase those costs, those increases will be treated the same as any other increases covered by the contract."

We cannot say that the parties intended that "new regulation" would require formal regulatory action under Montana's administrative procedure act. Rather, we believe the parties meant to use the term in its "ordinary and popular sense."[32]

The parties' manifest intent in providing for cost increases only for "*new* regulation"

was that the City of Austin should not bear the costs for Decker's failure to comply with existing law whether that failure was knowing, negligent, or innocent. Decker negotiated a base price and was not allowed to turn around and escalate that price because of legal requirements of which it should or could have known.

As the facts indicate, however, MDSL's action was not mere ministerial enforcement of a clear prohibition of the use of the land in question.[33] Decker's good faith belief in the truth of the statements made in its initial application, previously referred to, is not in question. As we have noted, Decker stated: "The Company assures the Department of State lands for the area covered by the application for prospecting permit includes no land having special, exceptional, critical, or unique characteristics as defined in Section 9(2) (a, b, c, d) Chapter 325, Laws of Montana 1973." The factual determination as to whether any part of the land affected by the mining operation was "Section 9" land took over two years to reach. When that determination was made only the Upper Deer Creek floodplain was so classified. Numerous conferences and on-site visits were required. Innumerable telephone calls and correspondence centered on this question.

Significant discretion was involved in MDSL's action. Their determination could not have been known beforehand by Decker, could not have been factored by the parties into the contract, and, consistent with the language and intent of the contract, therefore constitutes "*new* regulation."

The City of Austin states in its Post-Submission Brief that the action by MDSL not only was not "regulation" as intended by paragraph 9.06 but also was not "new" be-

---

**31.** *See, e.g., Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (effective date of decision delayed from June 28, 1982, until October 4, 1982).

**32.** Thus interpreted, "regulation" includes not only formal rule-making procedures and edicts but also administrative determinations which involve significant discretion and fact-finding

and which could not have been known prior to such determination. To illustrate, writing a parking ticket does not qualify as regulation.

**33.** It is noteworthy that the regulations enacted pursuant to the statute do not clarify the characteristics of "Section 9" land but merely refer to the statute itself. Mont.Admin.Code § 26–2.10(10)–S10270(4)(C) (1979).

cause "the statute prohibiting mining operations on Section 9 land was in effect prior to the critical date and this statute constituted the regulation which resulted in the increased cost." That statute had never been deemed applicable to the Deer Creek Valley area, however. MDSL's action thus constituted "new regulation." The fact that the statute upon which the regulatory action was based pre-dated March 31, 1974, no more disqualifies MDSL's actions as "new" than would a judicial decision based on an existing statute or on existing precedent. Indeed, all regulations are based on existing statutes. Austin's reading would thus render the "regulation" in paragraph 9.06 a nullity. The key element in "new" is "unknowable" or "uncertain" and beyond the parties' control. These elements are present here.

Consistent with this opinion, we therefore reverse and remand this case to the district court for a determination of costs properly allocable to the City of Austin. We expressly do not here conclude what those costs, if any, are to be.

REVERSED AND REMANDED.

RANDALL, Circuit Judge, dissenting:

The majority holds that the phrase "new legislation, regulation, judicial action, ... or labor agreement ... enacted, promulgated, or taken or made effective after March 31, 1974" in this coal procurement contract is unambiguous and means "administrative action[ ] ... take[n] ... subsequent to March 31, 1974," even when that "administrative action" was taken pursuant to a statute and comprehensive regulations that had been in place since June 1, 1973. Majority op., text following note 31, *supra*. *See* Montana Strip Mining and Reclamation Act, ch. 325, § 9, 1973 Mont.Laws 592, 601–02 (current version at Mont.Code Ann. § 82–4–227 (1979)); Mont.Admin.Reg. §§ 26–2.10(01)–S10270 to –350 (1973) (superseded). In so doing, the majority reverses the district court's finding that the "mere enforcement" or "new application" of the regulations to the mining area "does not constitute 'new legislation, regulation

or judicial action.' " The majority's holding also effectively imposes upon the utility customers of the City of Austin and the Lower Colorado River Authority a judgment (payable over the life of the contract) that, in the parties' preliminary estimation, should amount to something in the neighborhood of $50 million.

I join the distinguished group of judges who have held the provision in question to be unambiguous, but I agree with the district court that it cannot fairly be read as the majority reads it. I therefore dissent.

## I. THE FOUR CORNERS OF THE INSTRUMENT.

Like the majority, I begin with the text of the contract and with the Montana rules of contract construction, but I part company with the majority's analysis almost from the outset. I believe that the majority has misread the provision in question, article 9.06, has created an inconsistency between the contract's fifth and ninth articles, has made an unnecessary gap in the language of article 9, and has, for all practical purposes, treated this contract as though it were a "cost-plus" contract, which it plainly is not. I address each of these issues in turn.

### A. Contract Construction and the Text of Article 9.06.

Article 9.06 reads in its pertinent entirety as follows:

> The price of coal shall be increased from the base price in the same amount that the cost per ton of mining coal at the Mine is increased by any direct cost or required investment in order to comply with any new legislation, regulation, judicial action (other than the codification of the common law), or labor agreement ... enacted, promulgated, or taken or made effective after March 31, 1974.

Article 9.06. Each of the four nouns (legislation, regulation, judicial action, and labor agreement) is presented in a careful and deliberate order to match up precisely with the four, equally carefully ordered verbs (enacted, promulgated, taken, and made ef-

fective). This one-to-one matching produces a coherent statement about legislation enacted, regulation[s] promulgated, judicial action taken, and labor agreement[s] made effective. Any other match-up or jumble, e.g., judicial action enacted, produces nonsense. The operative provision, for our purposes, is therefore *regulation promulgated,* and no new regulation has been promulgated in this case.

The majority insists that this one-to-one matching approach is too artificial and that the contracting parties meant to cover all kinds of government action, but in its eagerness to demonstrate the invalidity of the one-to-one approach, the majority has overlooked the necessity for tying its *own* interpretation of the contract to the actual text. Whatever the intrinsic merit of my own reading, I submit that the majority must tie the word "regulation" to *one* of the four verbs, and that the majority has not done so for the simple (and all too obvious) reason that it cannot.

The contract uses the word in the sense listed second in most dictionaries, "[a] rule prescribed for the management of some matter." *See, e.g.,* 8 *Oxford English Dictionary* 380 (1933). So, too, does the majority opinion. Majority op., paragraph following text accompanying note 29, *supra.* But then at the crucial juncture the majority begins to use the word in its first sense, "the act of regulating." *See, e.g.,* Majority op., text accompanying note 32, *supra* (" 'new regulation' would [not] require formal regulatory action").[1] That meaning of the word does not fit back into the contract, nor does the majority even attempt to claim

that it does. Well established principles of contract construction in Montana prohibit exactly the kind of approach the majority has taken: "[A] court, in interpreting a written instrument, will not isolate certain phrases of that instrument in order to garner the intent of the parties." *Steen v. Rustad,* 132 Mont. 96, 102, 313 P.2d 1014, 1018 (1957). *See also Downs v. Smyk,* 604 P.2d 307, 310 (Mont.1979). The word "regulation" cannot be read as though it existed in the abstract, rather than in the grammatical context of a particular sentence.[2]

In short, the drafters of this contract knew what they were doing when they wrote article 9.06. The operative phrase is "new regulation promulgated," and applying an old regulation is simply not the same thing as promulgating a new one. The majority reaches a contrary conclusion only by ignoring the principle of *Steen v. Rustad* and by refusing to read the word "regulation" with *any* of the four verbs to which it might arguably be attached.

### B. The Relationship Between Articles 5 and 9.

The second unfortunate consequence of the majority's interpretation is that it creates a direct conflict between articles 5 and 9.06. Article 5 provides, in pertinent part:

Seller agrees to acquire and install at its East Decker mine the most modern machinery, equipment and other facilities (as determined by Seller) required to produce, prepare and deliver the quality and quantity of coal provided for in this agreement. Seller further agrees to operate and maintain said machinery,

---

1. To state the matter at its simplest, the sentence "Mining regulation in Montana is a complicated affair; the applicable regulations cover scores of pages" uses the word in the two different senses.

2. The majority has attempted to gloss over its failure to tie its interpretation to the text of the contract by invoking the well-worn principle that "words of a contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning unless used by the parties in a technical sense." Mont.Code Ann. § 28–3–501 (1981). This conclusion explains nothing and, as far as it does

go, is demonstrably wrong. Even if we managed somehow to read the word "regulation" without also looking at the sentence in which it appears, the word would *still* not mean what the majority says it means. When used in a thirty-four page, $350 million-plus contract—a document drafted by attorneys presumably expert in natural resources law—the word "regulation" has its normal specialized or legal meaning, that is, something promulgated in accordance with the Montana or United States administrative procedure acts and published either in the *Code of Federal Regulations* or in the *Administrative Rules of Montana.*

equipment and facilities in accordance with good mining practices so as to efficiently and economically produce, prepare and deliver said coal. *Seller further agrees that the machinery, equipment and facilities provided by it shall be acquired with its own capital.*

(emphasis added). The practical effect of this provision is that the start-up costs associated with opening the mine on the basis of the statutes and regulations in effect on March 31, 1974, were to be borne by Decker. There is no real disagreement here. The majority argues, rather, that article 9.06 modifies article 5 even in the absence of a change in those statutes and regulations. I do not believe that the contract can be fairly read that way.

The gist of article 5 is that Decker was supposed to pay for opening the mine "with its own capital," and not with money provided by the City of Austin. In return, the City agreed to pay a flat base price of $7 per ton. *See* article 8. Articles 9.01, 9.02, 9.03, 9.04(1), 9.08(a), 9.08(b), and 9.08(c) then provide exceptions based, respectively, upon multipliers of 1.06, 1.35, .23, .635, 1.7875, 1.7875, and .15—all of which (not coincidentally) add up to 7.0. The drafters clearly designed article 9.06 as the "second half" of article 5. That is, Decker was willing to assume—in return for the fixed base price (subject to price adjustments) of $7 per ton—all of the basic mining expenses associated with setting up a working mine that complied with all applicable statutes and regulations in effect as of March 31, 1974. The contradiction created by the majority's reading, in other words, arises out of the impossibility of giving full effect to article 5, which requires Decker to set up the mine with its own capital for a fixed base price of $7 per ton, if article 9.06 is read to increase the base price *even when the applicable statutes and regulations have not been changed.*

The majority quickly dismisses this argument on the apparent ground first, that "article 5 constitutes essentially boilerplate" and is, in any event, modified by article 9.06. *See* Majority op., paragraphs preceding and accompanying note 27, *supra.* This response is inadequate. Whether article 5 is boilerplate or not is irrelevant because whatever is in the contract we are required to enforce. More fundamentally, as I have already argued, article 9.06 most definitely does *not* allow Decker to pass on expenses associated with last-minute changes in its mining plan unless those expenses are caused by changes in or additions to the applicable statutes and regulations.

What appears to be the majority's primary argument for ignoring article 5 is even more disturbing:

> [T]he most obvious difficulty [with the dissent's argument] is that, if the parties did not intend interim government-mandated cost increases to be added to the price of coal, March 31, 1974, would not have been designated as the base date in paragraph 9.06; rather[,] the start-up date would have been used.

Majority op., paragraph accompanying note 26, *supra.* The majority's section-by-section chart of article 9 shows that the March 31, 1974 date was chosen for many reasons, *e.g.,* as the base date for calculating cost increases based on the indices published by the Bureau of Labor Statistics. Nothing in the choice of March 31, 1974 is inconsistent with Decker's assumption in article 5 of the duty to set up a working mine according to whatever plan it deemed most appropriate. The quoted portion of the majority's opinion is no more than a restatement of a desired conclusion, and not a persuasive argument.

The majority's interpretation of article 5 also has another troubling aspect. Contrary to what the majority suggests, what is involved here is not "damages," which the common law would require Decker to mitigate; rather, what is involved is a mandatory direct cost pass-through. Decker does not have any duty whatsoever to minimize its start-up costs. On the contrary, Decker has the express contractual right to open the mine with whatever machinery, equipment and other facilities it likes: "Seller agrees to acquire and install . . . machinery, equipment and other facilities (*as deter-*

*mined by Seller*) required to produce" coal. Article 5 (emphasis added). The contract has no mechanism for the City of Austin to share in the decisions about how, in view of the conditions attached to the mining permit, the coal was to be mined; yet, the majority's approach requires, in common sense and fairness, that there be such a mechanism if the City is to be saddled with the costs. It seems to me not only that the contract has no mechanism, but also that its article 5 expressly forbids us from creating one.

The best that can be said for the majority's reading of article 5 is that Decker may not have realized that its original mining plan would not be accepted and that there was a consequent need to provide for that eventuality in the contract. The majority has resolved this problem in Decker's favor through the simple expedient of misreading article 9.06 and reading article 5 out of the contract entirely. By way of reply I can only repeat that "[i]t is reversible error for [a Montana court] to insert into a contract language not put there by the parties," *Herrin v. Herrin*, 595 P.2d 1153, 1155 (Mont. 1979), and that the majority's holding that article 9.06 can be (mis)read without article 5 does not make that reading right.

## C. The Gap Created by the Majority's Reading of Article 9.06.

The third major problem with the majority's reading of the contract is that it creates an inexplicable gap in the otherwise fairly tight latticework of the contract. Article 9.06 provides that if "*the cost per ton of mining coal at the Mine* is increased by any direct cost or required investment," that increased cost may be passed on to the City of Austin (emphasis added). The problem, as the majority appears to concede, lies in calculating "the cost per ton of mining coal at the Mine" when the contract itself provides no schedule defining that cost. *See* Majority op., paragraph accompanying note 28, *supra*. Under my interpretation of the contract, the problem was very unlikely to arise, but under the majority's interpretation, the problem was almost unavoidable.

I find it hard to believe that the drafters of a contract as important and sophisticated as this one would not have expressly provided for a contingency that, given the majority's reading, was almost certain to arise.

As a general matter, it is difficult (though not impossible) to conceive of an "increase" in the "cost" of something unless that particular something is described, i.e., unless there is provided some kind of base figure or schedule from which the increase can be calculated. Under both my interpretation and that of the majority, if mining costs were increased "by any direct cost or required investment" after 1978 (when the mine entered production), the amount of the increase could be accurately calculated by consulting Decker's books. *See* article 17 (requirement that Decker keep books in accordance with generally accepted accounting principles). A cost increase imposed between 1974 (when the contract was signed) and 1978 (the start-up year) would present a more difficult problem: the contract provides no schedule of estimated costs, and actual cost figures would not yet have been developed. No one would argue that Decker should be forced to bear the increased expenses associated with a Montana statute or regulation enacted or promulgated between 1974 and 1978, and yet the contract clearly provides no precise mechanism for calculating how to pass on those increased expenses to the City of Austin. My argument would therefore appear to prove too much: if the contract provides a rule of decision that we could use as a basis for passing on the expenses associated with a pre-1978 but post-1974 statute or regulation, then it provides such a rule of decision for the present case as well.

I submit that this objection to my reading of the contract is not well taken. A statute or regulation enacted or promulgated between 1974 and 1978 would have been *unexpected*. Montana had just enacted a new mining statute, with a comprehensive set of interpretative regulations, in 1973 and—in the apparent and ultimately vindicated judgment of the parties—was not likely to make any material changes in that administrative scheme before 1978. The contract

admittedly does not deal very well (if at all) with the possibility of a pre-1978 statutory or regulatory amendment. But the unexpected is not this case. Decker knew from the very beginning that it would have to apply for a mining permit shortly after the contract was signed. The possibility of an adverse or partially adverse regulatory decision was real and immediate. If Decker had wanted to shift the burden of this known and expected risk to the City of Austin, it should have provided an appropriate contractual provision with an accompanying schedule of projected mining costs. *Cf.* article 9.02 (clause includes pre-opening labor cost increases, and provides sixteen-page schedule as "Exhibit B"). It did not, and, under Montana contract law, this court should not provide such a provision. *Herrin, supra,* 595 P.2d at 1155 ("It is reversible error for the District Court to insert into a contract language not put there by the parties.").

The majority's response to this no-base-schedule problem amounts to no more than a simple assertion that the problem is insignificant—with the implication that the courts can always step in and make the requisite calculations for the contracting parties. *See* Majority op., paragraph accompanying note 28, *supra.* Any lawyer who has ever participated in major contract drafting will immediately appreciate that this is not the way things are done: the *last* thing contract drafters want is uncertainty that may require expensive and time-consuming judicial intervention. And under the majority's interpretation, such intervention was almost certain to be necessary.

The majority further asserts—in two passages I find nothing short of astonishing—that the drafters could not, in any event, have provided the requisite schedule of mining costs because of the inherent uncertainties in the entire project. *See* Majority op., note 28, *supra* ("An accurate 'schedule' for such an unknowable, future occurrence contradicts the very uncertainty with which the parties were concerned."); Majority op., third-to-last text paragraph, *supra* (uncertainties "could not have been factored by the parties into the contract"). This is simply not so. The majority plainly does not understand how such a schedule is drafted. The base schedule in this case would have been based upon the working papers that Decker undoubtedly prepared when it made the calculations necessary for the submission of its original $7 per ton bid. If those projections then turned out to be overly optimistic—for example, if a change in the mining plan required the use of more trucks and shovels than had been anticipated—the later calculation of the increased costs would have been a matter of simple arithmetic.

The majority's interpretation also creates an internal inconsistency among the ten price adjustment sections in article 9. As I interpret article 9, all ten sections would almost surely have base figures; uncertainty would arise only in the unlikely event of a pre-1978 change in the applicable statutes and regulations. As the majority interprets the article, nine sections have base figures, but, in the very likely event that Decker's mining plan would have to be significantly altered, the relevant part of article 9.06 does not.[3] I think that it is improbable that the drafters would have provided precise numbers in nine instances, but not in one.

3. Column three of the majority's section-by-section chart of article 9 makes five mistakes: (1) The base for article 9.04(2) is 0 because the City pays all of that cost; (2) the bases for article 9.05 are the various published tax schedules in effect March 31, 1974; (3) see item (1), *supra;* (4) the "quality" portion of the contract is perhaps more specific than *any* other part of the contract, *see* articles 4 & 9.09 ("The adjustment in price shall be the amount derived by multiplying the percentage resulting from the ratio of the actual BTU value per pound of coal over 9,200 BTU per pound, times the delivered cost of the coal purchased hereunder at Buyer's consuming power plants, minus the delivered cost of coal at Buyer's consuming power plants before the BTU adjustment."); and (5) article 9.10 is surplusage and simply says that Decker may not charge a higher price than that allowed by law: the concept of a "base" in that context would not even make sense. All of this leaves article 9.06 as the only part of article 9 that, under the majority's reading, has no base.

The majority's indication in column 3 of the chart that the contrary is true is misleading in the extreme.

Articles 9.02 and 9.08(a) have an attached schedule (Exhibit B, which lists labor costs) and, had the drafters wanted to include the pre-1978 "cost increases" associated with the risk that the Montana Department of State Lands would require expensive changes in Decker's mining plan, they surely would not have failed to provide an appropriate schedule so that the amount of the increase could be calculated without recourse to litigation. The drafters knew how to write a true "cost-plus" provision for the pre-opening period. *See* articles 9.02, 9.08(a). They chose not to do so for article 9.06, and I think that this court should not do it for them.

### D. This Is Not a "Cost-plus" Contract.

Although Decker conceded at oral argument that it is "not arguing that this is a cost-plus contract in the sense that that's how it's written," the majority has effectively adopted precisely that approach:

> In short, adjustment is provided for all other interim cost increases; interim increases required by governmental action are not treated any differently under the terms of the contract itself. If we are to give effect to every part of the contract, we must conclude that qualified, interim government-mandated cost increases were to be treated like all other cost increases and added to the price of the coal.

Majority op., paragraph accompanying note 29, *supra* (footnote omitted); *see also* Majority op., paragraph accompanying note 26, *supra* (statement to the same effect). From the near all-inclusiveness of the various specific price adjustments in article 9, in other words, the majority argues that we can infer that the parties meant to pass along to the City of Austin the presently disputed expenses as well.

This argument falls immediately because it directly contradicts Montana contract law. The relevant statute provides:

> All things that in law or usage are considered as incidental to a contract or as necessary to carry it into effect are implied therefrom unless some of them are

expressly mentioned therein, in which case all other things of the same class are considered to be excluded.

Mont.Code Ann. § 28–3–702 (1981). The inclusion of the many price adjustments in article 9 does *not* imply the existence of other adjustments that might have been included in a "cost-plus" contract. On the contrary, the inclusion of the various adjustments means, under section 28–3–702, that we may not infer the existence of any other, extra-contractual adjustments.

I recognize, of course, that the Montana statute does little more than codify the maxim *inclusio unius, exclusio alterius,* and that mechanical reliance on a Latin maxim, even if statutorily mandated, generally should not replace sound substantive analysis. The point under section 28–3–702 needs to be made, however, because the majority's de facto "cost-plus" approach seems to have some surface appeal—and no basis whatsoever in the text of the contract or in the Montana rules of contract construction.

## II. THE EXTRINSIC EVIDENCE.

With all due respect for the parties and for the distinguished group of judges who have also read this contract, I think that it is appropriate to assume, for the sake of argument, that the contract is nevertheless unclear and that we therefore have occasion to examine evidence *dehors* its express language.

The parties, perhaps because each believes (no doubt for different reasons) that the contract is unambiguous, have submitted virtually no extrinsic evidence. We have been given no memoranda of telephone conversations, no accounts of contract bargaining sessions, no preliminary contract drafts—indeed, we have been given nothing except a thirty-one page report from the Bechtel Power Corporation. The following analysis is thus perforce confined to the report.

According to the report, four companies competed for the right to supply coal for the City of Austin's Fayette Power Project. Among the reasons for recommending

Decker's proposal over the others, the following was listed first: "Decker's is the only proposal which provides assurance of long-term price stability. The other three proposals contain explicit or implied clauses for renegotiation of the base price on an accept-the-increase-or-terminate-the-contract basis." Decker's bid was accepted, in other words, because *"[t]he Decker coal price is firm and there is no price renegotiation clause"* (emphasis added). This statement does, I believe, speak for itself. The fixed $7 per ton price induced the City of Austin to enter into this contract in the first place.

Having gotten the job on the basis of its "firm" $7 per ton bid, Decker has now been put in the same position as it would have been in had it submitted the same kind of flexible-base-price proposal as its three competitors. Decker now wants, according to its statement at oral argument, a base price of about $8 per ton (subject, of course, to the various adjustments of article 9). In short, Decker wants—and the majority has given it—the bid advantages of a low price without the consequent disadvantages of lower gross receipts once the job is won. This, in my view, is absolutely unacceptable.

Indeed, the majority has now put Decker in a *better* position than its three competitors would have been in. All they had asked for, according to the Bechtel report, was an accept-the-increase-or-terminate-the-contract provision. If I read the majority's opinion correctly, it has given Decker the accept-the-increase part of the formula without giving the City of Austin the correlative option of terminating the contract. This, too, in my view, is absolutely unacceptable.

The majority has not considered any of this extrinsic evidence for the ostensible reason that, if a contract is clear, Montana law prohibits the interpreting court from looking at anything else. I suggest that the majority's real (though unstated) reasons may have more to do with the impossibility of dealing with the Bechtel Power report without conveying the distinct impression that this case has been wrongly decided.

## III. CONCLUSION.

Article 5 of this coal procurement contract expressly provides that Decker shall bear the expenses in issue. That article gives Decker the right to set up the mine in whatever sound manner it likes and the duty of doing so with its own capital. Article 9 then provides for a number of price adjustments, but none of those adjustments affects Decker's article 5 duty in the present case because the relevant triggering event—a change in the applicable statutes or regulations—has not occurred.

The majority reaches a contrary conclusion by making two interpretative mistakes. First, the majority virtually ignores article 5. Second, the majority misreads article 9.06 by posing the relevant interpretative question in terms of one meaning of the word "regulation" ("a rule prescribed for the management of some matter") and the answer in terms of an entirely different meaning ("the act of regulating"): the practical consequence of the majority's sleight-of-hand is that it cannot tie its interpretation of the word ("the act of regulating") to *any* of the four verbs in the contract to which it might arguably be attached. In order to have read the word in the contract—as the Montana rules of construction require us to do—the majority would have had to have adopted a meaning of the word that it cannot adopt without conceding that it has wrongly decided this case.

I submit that the majority's interpretation does not make sense on *any* level. If Decker had wanted to pass on to the City of Austin the risks associated with applying for a mining permit from the Montana Department of State Lands, it should have expressly done so in the contract. Contracts of this caliber should not be "saved" by the Fifth Circuit, particularly when doing so creates both an obvious gap (how do we calculate the "cost" to be passed through here?) and an obvious inconsistency (between articles 5 and 9). The City of Austin entered into this contract in the first place principally because "[t]he Decker coal price is firm and there is no price renegotiation clause." Now, according to the majority, that price must be renegotiated without

offering the City the correlative option of terminating the contract. Since the contract (for obvious reasons) has no mechanism for this renegotiation, what should have been a simple matter of arithmetic and contract interpretation has become a complicated proceeding for "damages."

I recognize that this is a diversity case in which Montana law governs. Nevertheless, I have prepared a dissent from the majority's opinion not simply because I think that the legal conclusions reached by that opinion are incorrect. I am greatly troubled by the fact that in order to remedy a mistake made by a Montana coal company in assessing the possible impact of the Montana statutory and regulatory scheme on its mining plan, the majority has, in effect, saddled the already overburdened utility customers served by the City of Austin and the Lower Colorado River Authority with a $50 million judgment representing a fourteen percent increase over what the parties agreed to as the cost of the coal.

I respectfully dissent.